**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Donald E. MEADOWS,
Defendant-Appellant.**

**No. 78–5572.**

United States Court of Appeals,
Fifth Circuit.

July 13, 1979.

---

Godbold, Circuit Judge, concurred in part and dissented in part and filed opinion.

Alvin B. Rubin, J., dissented in part and filed opinion.

P. Bruce Kirwan, Federal Public Defender, Atlanta, Ga., for defendant-appellant.

Janis H. Kockritz, Atty., Dept. of Justice, Appellate Sect., Crim. Div., Washington, D. C., for plaintiff-appellee.

Before TUTTLE, GODBOLD and RUBIN, Circuit Judges.

TUTTLE, Circuit Judge:

Meadows was a CETA[1] employee who, through an administrative error, received duplicate paychecks and cashed them until the mistake was discovered. He was convicted of "obtain[ing] by fraud" the duplicate paychecks in violation of 18 U.S.C. § 665. Because the district court improperly charged the jury in its definition of fraud as applied to the facts of the case, we reverse and remand for a new trial. Other issues raised in this appeal which may arise on retrial are also considered.

## I. FACTS.

Meadows was indicted on one count of violating 18 U.S.C. § 665.[2] The relevant

---

1. Comprehensive Employment and Training Act of 1973. Under the CETA program, the United States Department of Labor grants money to individual cities to fund projects providing job education and experience.

2. 18 U.S.C. § 665 provides:

(a) Whoever, being an officer, director, agent, or employee of, or connected in any capacity with, any agency receiving financial assistance under the Comprehensive Employment and Training Act of 1973 embezzles, willfully misapplies, steals, or obtains by fraud any of the moneys, funds, assets, or

facts are these. Meadows had begun working as a CETA employee in January, 1975, when he was hired to train as an Industrial Waste Inspector for the Atlanta Department of Environment and Streets, Bureau of Pollution Control. A dispute arose as to the wage scale upon which Meadows was to be paid, and after a long series of discussions with various department heads and the mayor himself—in which Meadows alleged that he was being discriminated against—he was transferred to another CETA position with the Institute of the Black World in the Department of Community and Human Development. As a result of the previous salary grievances, it was agreed that Meadows' pay scale would be raised at his new position with the Institute of the Black World. Although Meadows was transferred to Black World, he was told that he would continue to be paid at the lower scale and was to pick up his checks at the Bureau of Pollution Control in City Hall until he could be switched from one payroll to the other. A few weeks later, Meadows began to receive his paychecks at the increased salary scale directly from Black World and quit going to City Hall to pick up checks from the Bureau of Pollution Control.

On September 21, 1976—just one week after Meadows had received his regular paycheck from Black World—he received a call from his CETA counselor, informing him that there was a paycheck for him at City Hall from the Department of Environment and Streets. Meadows picked up the check and cashed it. One month later, again while receiving his normal check from

Black World, Meadows received another call from his counselor to pick up an Environment and Streets' paycheck at City Hall. He also picked up this check and deposited it in his personal bank account. Thereafter, from October 4 to December 13, 1976, Meadows personally and on his own initiative went to City Hall each week after receiving his normal paycheck from Black World and claimed the additional check from the Department of Environment and Streets. The net amount of each additional check was exactly the same as he had been earning each week at the Bureau of Pollution Control.

In December, 1976, Meadows picked up a yearly bonus check from Black World. Since the check was roughly one-half of a full year's bonus, Meadows complained to the Atlanta supervisor of CETA personnel records. He also picked up a full bonus check at City Hall from the Department of Environment and Streets.

When a financial analyst looked into Meadows' complaint regarding his Black World bonus, it was discovered that Meadows had been receiving two paychecks as a result of an administrative error at the Inspection and Monitoring division of the Bureau of Pollution Control. The timekeeper had been instructed to continue reporting Meadows' time even though he was no longer working there to insure that he remained on a CETA payroll until he was transferred to another CETA position. When Meadows was picked up on the payroll at Black World, no one informed the

property which are the subject of a grant or contract of assistance pursuant to this Act shall be fined not more than $10,000 or imprisoned for not more than two years, or both; but if the amount so embezzled, misapplied, stolen, or obtained by fraud does not exceed $100, he shall be fined not more than $1,000, or imprisoned not more than one year, or both.

The indictment alleged that the appellant "did embezzle, misapply, steal and obtain by fraud" the money he received from CETA. However, the district court concluded as a matter of law that the appellant's actions could not constitute embezzlement, stealing, or misapplying; and therefore instructed the jury only on the issue of fraud. While larceny may have been a more appropriate theory upon which to present the case to the jury, see, e. g., Thaggard v. United States, 354 F.2d 735 (5th Cir. 1965); United States v. Rogers, 289 F.2d 433 (4th Cir. 1961); R. Perkins, Criminal Law at 254 (2d ed. 1969); the court's holding was not appealed by the government and thus we are powerless to review it. See generally United States v. Posner, 408 F.Supp. 1145 (D.Md.1976), aff'd per curiam, 551 F.2d 310 (4th Cir. 1977), cert. denied, 434 U.S. 837, 98 S.Ct. 127, 54 L.Ed.2d 99 (1977); Sapp v. State, 157 Fla. 605, 26 So.2d 646 (1946); Territory v. Lee, 29 Hawaii 30 (1926); Wolfstein v. People, 6 Hun 121 (N.Y. 1875).

timekeeper at the Department of Environment and Streets to remove him from their payroll.

The record is clear that Meadows did nothing to cause this initial administrative error. He only began picking up the checks after he was called by his CETA counselor. Meadows readily admitted that he had picked up the extra checks and cashed or deposited them into his account, but stated that he had thought the first extra check was some sort of severance pay and then figured the other checks may have been a subtle way to compensate him for the discrimination he had complained of while working at the Bureau of Pollution Control. The prosecution introduced testimony to rebut this defense. Several CETA officials who met with Meadows after the discrepancy was discovered testified that he admitted to them that he was aware after the first additional check that the paychecks from his former position had been issued erroneously and that he knew the only checks he should have been receiving were those from Black World.

## II. THE FRAUD INSTRUCTION.

During the course of the general charge, the trial court gave the following instruction to the jury:

I charge you that fraud is an intentional perversion of truth for the purpose of inducing another in reliance upon it to part with some valuable thing belonging to him or to surrender a legal right; a false representation of a matter of fact whether by words or by conduct, by false or misleading allegations, or by concealment of that which should have been disclosed which deceives and is intended to deceive another so that he can act upon it to his legal injury.

*In determining whether or not the defendant, Mr. Meadows, in this case obtained CETA funds by fraud as charged in the indictment, the jury may consider acts and omissions as well as affirmative statements, because under the law fraud may result from state-ments of half-truths or the concealment of material facts.*

(emphasis added).

The appellant's trial counsel made several objections to this charge, one of which we feel has merit. Although the court gave an adequate dictionary definition of fraud in the first paragraph quoted above, it poisoned the otherwise healthy charge when, in the second paragraph, it applied the law to these facts. By stating merely that "fraud may result from statements of half-truths or the concealment of material facts," without more, the court understated the principle of law by failing to remind the jury of the intent required to convict. *Pence v. United States,* 316 U.S. 332, 338, 62 S.Ct. 1080, 86 L.Ed. 1510 (1942). Such an understatement on a specific and paramount issue, at this critical stage of the charge when the jury was instructed on how these elusive and ethereal principles should be applied to the facts of the particular case, created reversible error that could not be cured by the unexceptional abstract charge. Further, the error was exacerbated by the court's repetition of the same language in two supplemental charges. After deliberating for approximately three hours, the jury sent a note to the trial court indicating that they wanted further instruction on the legal definition of fraud. The court repeated the above quoted instruction twice, the defense counsel renewed his objections, and after additional deliberation of only fifteen minutes, the jury returned its verdict of guilty. It is clear that the crux of the jury's confusion was how the unfamiliar legal definition of fraud was to be applied to the unique facts of this case. The understatement created the possibility that the jury might have convicted Meadows for an innocent, unintentional omission of a material fact. Although there may be sufficient evidence to indicate that Meadows' conduct in continuing to pick up the paychecks which he knew were mistakenly issued to him constituted fraud, the question is not whether guilt may be spelt out of a record, but whether guilt has been found by a jury according to the procedure and standards appropriate for criminal trials in

the federal courts. Although we realize, of course, that all instructions must be considered as a whole, and not word-by-word or phrase-by-phrase, such a fundamental understatement as to the paramount issue at a critical stage of the instruction requires reversal.

## III. FAILURE TO GRANT JUDGMENT OF ACQUITTAL.

█ Meadows contends that the trial court committed reversible error in failing to grant his motions for judgment of acquittal at the close of the government's case and at the close of all evidence. The basis of his argument is that since he engaged in no "active fraud" in obtaining the extra paychecks, there was no reason for the court to have allowed the case to go to the jury on the charges of obtaining CETA funds by fraud. We disagree.

The appellant's contentions misconstrue the nature of Meadows' conduct and the law of fraud. Although he may have taken no action to initiate the issuance of the paychecks, his conduct in picking up checks for several months which he admittedly knew were erroneously issued was sufficient evidence of fraud to warrant submission of the case to the jury.

Although we generally consider fraud as a false representation or concealment of a material fact that should have been disclosed, when made with knowledge of its falsity and with intent to deceive another so that he can act upon it to his legal detriment, e. g., *Pence v. United States,* 316 U.S. 332, 338, 62 S.Ct. 1080, 86 L.Ed. 1510 (1942); *United States v. Nill,* 518 F.2d 793, 800 (5th Cir. 1975), this amorphous concept "is measured by a nontechnical standard. 'It is a reflection of moral uprightness, of fundamental honesty, fair play and right dealing in the general and business life of members of society', *Gregory v. United States,* 5 Cir., 1958, 253 F.2d 104, 109." *United States v. Bruce,* 488 F.2d 1224, 1229 (5th Cir. 1973), *cert. denied,* 419 U.S. 825, 95 S.Ct. 41, 42 L.Ed.2d 48 (1974). It has been said that "the law does not define fraud, it needs no definition; it is as old as falsehood and as

versable as human ingenuity." *Blachly v. United States,* 380 F.2d 665, 671 (5th Cir. 1967), *quoting Weiss v. United States,* 122 F.2d 675, 681 (5th Cir.), *cert. denied,* 314 U.S. 687, 62 S.Ct. 300, 86 L.Ed. 550 (1941); *see also Abbott v. United States,* 239 F.2d 310, 314 (5th Cir. 1956).

We feel that under the broad prohibition of fraud intended by § 665 and the definition of fraud as embraced by the courts, it is possible that a jury could have inferred from the evidence in this case a knowing false representation or material omission by Meadows which facilitated his ability to continue picking up checks from his old job while receiving his normal compensation from his new job. The jury could have found from the evidence that Meadows impliedly but affirmatively misrepresented that he still worked at the Bureau of Pollution Control when he continued to claim the extra paychecks at City Hall for several months, and that the City relied on this misrepresentation by continuing to issue the duplicate checks. It would not be unreasonable for the jury to assume that if Meadows had left the checks unclaimed, the city would have realized the error and stopped issuing the checks. Alternatively, the jury could have found that, by failing to inform the proper city officials that he was no longer working at the Bureau of Pollution Control and was receiving paychecks from Black World, Meadows concealed a material fact, thus insuring that the city would continue to issue the paychecks and that he would continue to benefit from the city's initial mistake. Although it is clear that Meadows made no false inducements to obtain the extra paychecks initially, his conduct in continuing to pick them up with knowledge of the obvious error came sufficiently within the broad sweep of 18 U.S.C. § 655 to go to the jury.

## IV. RULE 408—OFFER TO COMPROMISE.

█ Meadows contends that the trial court committed reversible error by admitting certain statements he made to a government official when he was confront-

ed with the fact of the overpayments, on the grounds that the statements were part of compromise negotiations and should have been excluded on the basis of Rule 408, Federal Rules of Evidence.[3] We disagree.

These statements occurred in an interview between Meadows and a program analyst for the Labor Department named Goldsmith. Goldsmith had received a memorandum from Meadows' CETA supervisor with Black World, which indicated that Meadows had complained because he had not received his full bonus check. Goldsmith reviewed the records and found that while Meadows' Black World bonus check was deficient, Meadows had received a full bonus check from the Bureau of Pollution Control, and moreover, had been carried simultaneously on two departments' payrolls for several months. Based on these discoveries, Goldsmith decided to hold Meadows' checks and when Meadows came to Goldsmith's office, he was confronted with the problem. When testifying for the government on direct examination, Goldsmith stated that Meadows' immediate response was an admission that he knew after the first check that there was some sort of administrative error causing the duplicate checks to be issued, but declared that "if you were stupid enough or somebody else makes the mistake, I felt that I could benefit from it." On cross-examination, the defense counsel brought out that Meadows subsequently agreed to a repayment schedule.

Although the government contends that Rule 11(b), Federal Rules of Criminal Procedure, rather than Rule 408, Federal Rules of Evidence, governs the issue since this is a criminal case, we assume the applicability of Rule 408 to govern the admission of related civil settlement negotiations in a criminal trial. F.R.Evid. 1101(b), *see Ecklund v. United States,* 159 F.2d 81 (6th Cir. 1947). We do not, however, find any violation of the rule. We do not feel that Meadows' remark to Goldsmith that he knew the checks were issued by mistake was in any sense an offer to compromise a claim. The conversation occurred during an informal investigation of the situation; thus, there was no claim to compromise at the time the two first met. The prosecution merely made use of a direct admission with respect to Meadows' intent, which is, of course, probative evidence of his state of mind. Although the testimony concerning the repayment schedule might otherwise have been barred by rule 408 as a settlement offer, this testimony was solicited by the defense counsel on cross-examination. We reject the appellant's contention that he was "forced" to introduce this testimony of the repayment schedule; it appears to us to be a calculated, tactical defense decision.

## V. SUPPLEMENTAL CHARGE.

As we stated earlier, the jury requested additional instructions on the definition of fraud during the course of its deliberations. In response, the court merely repeated the small portion of its original charge describing the law of fraud and its application to these facts. The supplemental instructions contained no reference to the burden or quantum of proof, presumption of innocence, or any other matter necessarily favorable to the defendant. The defense counsel objected and requested some additional balancing instruction, but the trial court refused. The jury returned its verdict of guilty within fifteen minutes. Since the case will have to be retried, it may be helpful to comment on the procedure followed.

---

**3.** Rule 408 provides:

Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. This rule does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations. This rule also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.

It is well-established that in giving additional instructions to a jury; particularly in response to inquiries from the jury, a court must be especially careful not to give an unbalanced charge. Although the failure to give any presumption of innocence instruction does not mandate reversal in all criminal appeals, *Kentucky v. Whorton,* —— U.S. ——, 99 S.Ct. 2088, 60 L.Ed.2d 640 (1979), the particular significance of a supplemental charge when a jury has been unable to reach a decision on the basis of all it has heard up until that time demands an exacting sensitivity on the part of the trial court to give an accurate and balanced instruction. *Bollenbach v. United States,* 326 U.S. 607, 612, 66 S.Ct. 402, 90 L.Ed. 350 (1946); *United States v. Carter,* 491 F.2d 625, 633 (5th Cir. 1974). While in this case, we would hesitate to reverse the judgment for the failure to recharge with respect to the presumption of innocence and the burden of proof; on retrial, if the court chooses to give any additional charge and quite reasonably elects not to repeat the entire original charge, the court could simply remind the jury of the burden and quantum of proof and presumption of innocence, or state that all instructions must be considered as a whole, or take some appropriate steps to avoid the possibility of prejudice to the defendant. This procedure will provide a minimum of balance without any undue burden.

REVERSED AND REMANDED.

GODBOLD, Circuit Judge, concurring in part and dissenting in part:

I agree with Judge Tuttle that the case must be reversed but for a different reason.

The portion of the jury instruction that he quotes was immediately preceded by the following instructions:

> The defendant contends in response to this charge of the grand jury, ladies and gentlemen, that when he failed to report that he had been issued a check by error in addition to his regular paycheck and instead deposited the extra check in his own bank account, he did not have the specific intent to do something that the law forbids, but instead assumed that the extra check was compensation for back pay which he thought was owed to him by the City of Atlanta, and pursuant to the Comprehensive Employment and Training Act of 1973.

Section 665 of Title 18 of the United States Code provides in pertinent part . . . that whoever being an officer, director, agent or employee receiving financial assistance under the Comprehensive Employment and Training Act of 1973, embezzles, willfully misapplies, steals or obtains by fraud any of the monies, funds, assets or property which is the subject of a grant or contract of assistance pursuant to this Act, shall be guilty of an offense against the laws of the United States.

For a violation of this particular statute, codified as Section 665A of Title 18 of the United States Code to have occurred, the government is required to prove three essential elements beyond a reasonable doubt:

First, that the defendant was an employee or connected in some capacity with some agency receiving a grant of financial assistance under the Comprehensive Employment and Training Act of 1973.

Second, that the defendant obtained by fraud some money, funds, or other property which was the subject of the grant at or about the time charged.

Third, that the defendant committed such act or acts knowingly and willfully.

The burden is always upon the government to prove beyond a reasonable doubt each and every one of those essential elements which I have just outlined for you. The law never imposes upon a defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence.

In this connection, ladies and gentlemen, I charge that an act is done knowingly if done voluntarily and intentionally and not because of mistake or accident or other innocent reason. The purpose of adding the word "knowingly" is to insure that no one will be convicted for an act

done because of mistake or accident or other innocent reason.

I further charge you that an act is done willfully if done voluntarily and intentionally and with the specific intent to do something that the law forbids, that is to say, with bad purpose either to disobey or to disregard the law, or stated another way, purposely intending to violate the law.

The statute, Code Section 665A of Title 18 which I just read to you a moment ago . . . talks in terms of embezzles, willfully misapplies, steals or obtains by fraud any of the monies, funds, assets or property which are the subject of a grant or contract of assistance pursuant to the Act. Under the evidence in this case, ladies and gentlemen, I charge you as a matter of law that the government has not proved that there occurred in this case any embezzlement of any funds, nor has the government proved a willful misapplication of funds, or that the funds were stolen. The only issue which you will consider and about which I will instruct you later is whether or not these funds were obtained by the defendant through fraud.

These instructions followed an orderly and reasonable pattern:

(1.) What is the defense? It is "no intent."

(2.) What are the elements of the offense?

—Employment

—Obtaining by fraud

—A knowing and willful act

(3.) What is knowing and willful? It means voluntarily, intentionally, with specific intent.

(4.) No problem of embezzlement, willful misappropriation or theft. Fraud is the only issue.

(5.) What is fraud?

This was a clear, orderly and adequate explanation. When the judge followed it with the paragraphs quoted by Judge Tuttle there was no necessity that he reiterate what he had clearly said more than once only a few sentences and a few breaths earlier—that the statute required knowing and willful conduct and knowing and willful meant intent. Throughout the instruction fraud and intent were delineated and described as separate elements. When the judge described fraud he was not required to go back and redescribe the intent element.

In my opinion, however, the supplemental instruction was reversible error. This was what the original charge was not, a discussion, in isolation, of fraud. At this stage of the proceedings the jury, not experienced in the law like judges, does need a balanced explanation. It would have required only a few sentences to point out that along with fraud there were two other elements of the offense and to note that the defendant was protected by the presumption of innocence and that guilt must be found beyond reasonable doubt. I cannot agree with Judge Rubin that the judge need not give a "balanced instruction" when he responds to a single-shot question. The risk against which the requirement of a balanced instruction protects is the possibility that question and answer, in isolation, may be misleading. It simply begs the question to conclude that, because the question is isolated, no balancing instruction is needed.

I do not agree with Judge Rubin's theory that as a matter of law what Meadows did, though probably "stealing," was not fraud. I have no trouble in concluding that one who goes weekly for nearly two and a half months to the pay office of an agency for which he no longer works, and thereby seeks and obtains delivery to himself of paychecks to which he is not entitled, is guilty of fraud. Judge Rubin's "man of common intelligence" does not have to guess to know this is fraud. The point might be arguable if the check had been mailed to Meadows. Here the check was turned over to his possession only because he went to the place he had no business in going, held out his hand, and somebody placed the check in it. Or perhaps he thrust his hand into a pigeonhole and extracted the check. In any event, it did not fall like

manna from heaven into his surprised and innocent hand.

ALVIN B. RUBIN, Circuit Judge, dissenting in part:

I concur in Parts I and IV of the opinion, and all of Part II save the phrase on typewritten page 987 that states, "Although there may be sufficient evidence to indicate that Meadows' conduct in continuing to pick up the paychecks that he knew were mistakenly issued to him constituted fraud . . ." Respectfully I dissent from this observation, from all of Part III of the opinion and from some of the observations in Part V.

To begin at the end, I do not think that a trial judge, when asked a direct question by a jury that he answers in a completely neutral fashion, needs to embellish his answer with unnecessary admonitions. Of course, the court should never give an unbalanced charge either initially or in responding to jury inquiries. If a jury asks a question that can be answered succinctly, directly and dispassionately, I would not require the district judge to renew other parts of his charge.

The jury here asked for a supplemental instruction on fraud; the trial judge reread just that charge, without additions, deletions or further explanations. When the judge receives such requests, he may use his sound discretion in responding. He may choose merely to answer what is asked, or he may consider it desirable to add further instructions. I would not, therefore, add the suggestion included by my brethren that the court "could simply" do something other than he did "without any undue burden." If this is admonitory or precatory, it can lead only to confusion and serve as a fulcrum for other appeals. If this is a mandate, I think it inappropriate and incorrect.

Returning to the issue of sufficiency of the evidence, I do not think the evidence warranted a verdict of guilty on the charge that remained when the case went to the jury, and I, therefore, would hold that the trial court erred in refusing to direct a verdict of acquittal. The best resume of the evidence against Meadows is in the phrase quoted: all he did was continue to pick up the checks and then to cash them. There is no evidence that he ever spoke a word or did an act affirmatively misrepresenting a single fact. Silence constitutes fraud only when there is a "duty to speak or where an inquiry left unanswered would be intentionally misleading." *United States v. Prudden,* 5 Cir. 1970, 424 F.2d 1021, 1032, *cert. denied,* 400 U.S. 831, 91 S.Ct. 62, 27 L.Ed.2d 62. *See also Atilus v. United States,* 5 Cir. 1969, 406 F.2d 694, 698; *American National Insurance Co. v. Murray,* 5 Cir. 1967, 383 F.2d 81, 86–87. Nothing in the evidence indicates that Meadows had a duty to volunteer the information, "I am no longer employed in the Bureau of Pollution Control," or was ever asked about his position.

There are many cases holding that conduct like that engaged in by Meadows is stealing. *See* the cases cited in footnote 2 of the majority opinion. *See generally* Fletcher, Rethinking Criminal Law, § 2.4.2 at 107 (1978).[1] Indeed, the government

---

1. Professor Fletcher points out in this seminal work:

The following four cases of dishonest acquisition have taxed the ingenuity of courts and scholars across the Western world:

I. The suspect D hires a horse from X with the intent to steal it and later does appropriate the horse to his own use. The same type of case is raised by anyone who, with a fraudulent purpose, receives the chattel from a prior possessor.

II. The suspect D finds a ring on the street that is apparently lost. He picks it up and keeps it without reporting the finding to the police or taking other measures to locate the owner.

III. *The suspect D requests the withdrawal of funds from his account; X, a bank teller, mistakenly delivers excess funds to D, who knows of the mistake and leaves the bank with the intent to keep the money.*

IV. A customer enters a bank, hands a note to the teller D with the intent of depositing it. D pockets the note without putting it in the customary cash drawer.

All four of these cases are instances of dishonest, immoral behavior and for that reason, there is considerable pressure in virtually every legal system to bring them within

charged that he "did embezzle, misapply, steal and obtain by fraud" the money he received from CETA. Only because the trial court, perhaps erroneously, dismissed all of the charges based on other provisions of § 665 was the jury left to struggle with the definition of "fraud." The government should have appealed the dismissal of the parts of the charge that alleged criminal acts other than fraud. It failed to do so. I would not allow it to retrieve that apparent error.

What Meadows was charged with was obtaining money by fraud. What he did was immoral, but he should not, indeed, under the constitutional guarantee of due process can not, be convicted merely because he got and kept money that was not rightfully his unless this conduct has been condemned by statute. Before a person can be convicted of a crime, due process demands both that there be a statute proscribing the conduct that is considered criminal and that the crime be defined with sufficient clarity "that men of common intelligence" need not "guess at its meaning." *Connally v. General Construction Co.,* 1926, 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322, 328. The first concept was embodied

in the maxim *"nulla poena sine lege"* long before the Constitution embraced it; the second is the familiar void-for-vagueness standard. It appears to me that to punish Meadows on the ground that his conduct constituted obtaining money by fraud violates both.

A little over a century ago in *The Queen v. Middleton,* 1873, L.R. 2 Cr.Cas.Res. 38, 56, Justice Bramwell said in dissent that the justices who had concurred in a conviction believed that "the prisoner was as bad as a thief . . . and being as bad, ought to be treated as one. . . ." Like my brethren, I believe that Meadows was as bad as a defrauder; I simply do not find that he committed the statutory offense.

Congress doubtless could have so defined Meadows's conduct as to make it criminal, not only as larceny, but as a special crime or as a species of fraud by imposing a statutory duty on persons who receive federal checks to say they are not entitled to them, if they are not, or even by constituting as fraudulent the mere act of receiving delivery of a check knowing it is not due with intent to convert the money to one's own use. It has simply not done so. Due proc-

the ambit of one of the theft offenses. Yet because they all lie at the boundaries among the three offenses, each of the leading Western legal systems classifies these problems differently. And not all systems punish all four forms of dishonest acquisition. *The remarkable feature of Anglo-American law is that the courts concluded that the first three of these problematic cases were to be resolved by distending the law of larceny.* (Emphasis supplied.)
The text continues:
The problem of mistaken delivery and receipt is the third of the points at which the common law felt pressure in the course of the nineteenth century. In the typical case, the suspect passively and quietly receives a mistaken remittance from a bank teller. Though he leaves the bank with a fraudulent intent to keep the funds transferred to him, he does nothing except take advantage of someone else's mistake.
Though nineteenth-century English and American courts extended the crime of larceny to cover this type of dishonest acquisition, the French and German systems still balk at subjecting this conduct to any form of criminal liability. French writers steadfastly

maintain that the dishonest depositor who takes advantage of the teller's mistake is exempt from all criminal liability. The crime of larceny does not apply because the voluntary delivery precludes the requisite taking (soustraction). Embezzlement is precluded, for it appears that the teller intended to part with title as well as possession of the excess funds. The crime of fraud would not apply, for there is no fraudulent maneuver. The French stand on this case reflects a strong commitment to the literal and restrictive interpretation of criminal statutes.
Relying on the same reasoning, German judges would decline to punish the depositor's acquisition as either larceny or embezzlement. Fraud remains an option, for German law recognizes a broadly defined crime of fraud that covers implicit misrepresentations by conduct as well as explicitly fraudulent maneuvers. The precise facts of this problematic case came before the German courts in 1968 and the trial court convicted the depositor of fraud. The appellate court reversed the judgment. [*Id.* at pp. 20–21.]
Soviet law also would not classify this conduct as fraud. *Id.* at p. 22.

ess forbids us to remedy the lacuna we perceive in its draftsmanship of a criminal statute. *See United States v. Perrin,* 5 Cir. 1978, 580 F.2d 730, 738–39 (Rubin, J., dissenting).

It is difficult to determine exactly what Meadows did that constituted obtaining by fraud. Was it his failure to speak when he picked up and cashed the first check? The second? Was it his pattern of conduct from October to December? My brethren characterize as fraud "his *conduct* in picking up checks for several months which he admittedly knew were erroneously issued . . ." (emphasis supplied), so apparently the mere act of presenting himself more than once to receive delivery of a check is what they consider fraudulent. I cannot so characterize that simple act, nor does it appear to fit into any accepted definition of fraud. The opinion does not help us in that regard; instead of defining fraud, it quotes some aphorisms about rectitude as a help in describing what is labelled an "amorphous concept."

It is difficult for me to find a person guilty of violating a criminal law that relies on an "amorphous concept," that forbids acts that simply are not "morally upright," or "fundamentally honest," that is based on "fair play and right dealing" and proscribes conduct that "needs no definition; . . .. is as old as falsehood and as versatile as human ingenuity." These are all nice turns of phrase and I, like other judges, have used similar language to make or explain a point. They do not, however, define fraud or tell us what is fraudulent or what Meadows had a duty to do or to say and when.

To my brethren "it is clear that Meadows made no false inducements to obtain the extra pay checks initially." There is no evidence that he made any false inducement thereafter. And, finally, repetitiously, I fail to find that he had a statutory or common law duty to speak. Therefore, I would free this immoral and corrupt man and allow the government to seek restitution civilly rather than go beyond the statute to give him the penalty he may deserve but one that Congress has not imposed.