IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

July 30, 2008

Charles R. Fulbruge III
Clerk

No. 07-50869

UNITED STATES OF AMERICA

Plaintiff-Appellee

v.

SANTIAGO EFRAIN VALLE

Defendant-Appellant

Appeals from the United States District Court
for the Western District of Texas

Before JONES, Chief Judge, and WIENER and CLEMENT, Circuit Judges.

EDITH BROWN CLEMENT, Circuit Judge:

Santiago Valle was convicted of bribery and extortion. He appeals his convictions. We affirm.

## I. FACTS AND PROCEEDINGS

On September 13, 2006, Valle was indicted on one count of bribery, in violation of 18 U.S.C. § 201(b)(2)(C), and one count of extortion, in violation of 18 U.S.C. § 872. He was tried by a jury. The evidence at trial showed that Valle was employed as an Immigration and Customs Enforcement agent, assigned as a classification officer to the Department of Homeland Security's ("DHS") El Paso Processing Center, an immigration holding and processing detention facility. Detained aliens were brought to the center by various agencies that

provided the alien registration file for each detainee. The alien registration file contained initial reports, such as an arrest form, notice to appear, and an I-213, which is the record-of-deportable-alien form. When turned over to the facility, a processing officer reviewed each file and determined the alien's classification within the center, depending upon his criminal history. After processing, the alien registration files were sent to the deportation section to begin removal proceedings, and a detention file was created. Valle's duty as a classification officer was to review each detainee's detention file to confirm that he was properly classified. He also had access to the alien's registration file held at the deportation section. If officials became aware of new criminal charges against a detainee that were not known when the alien was initially processed, they would contact officials of the agency that issued the warrant to determine if they wanted the alien extradited to them.

In addition to his duties as a classification officer, Valle was assigned to collect intelligence. After reviewing the aliens' I-213 forms, he had the authority to interview detainees to obtain information about alien smuggling, contraband in the facility, or anything else that would benefit the DHS or any other agency. After gathering intelligence, Valle often generated reports and provided them to the appropriate authorities. His collateral duty to collect intelligence gave him additional authority to review alien registration files that had been sent to the deportation section.

During Valle's employment, he met with Francisco Gutierrez-Avila ("Gutierrez"), a Mexican national, who was in custody at the facility. On the night that Gutierrez was taken into custody, he had been driving in a separate car behind his daughter who was driving a vehicle that Gutierrez owned. Both cars were stopped at a Border Patrol checkpoint, and the officers determined

2

that some of the occupants of the car that Gutierrez's daughter had been driving were illegal aliens. Gutierrez was detained for traveling outside the parameters authorized by his visa.

During his first meeting with Gutierrez, Valle asked him if he knew Mario or Mauricio Romero, from whom Gutierrez had borrowed money for his business. Valle told Gutierrez that he was a former brother-in-law of the Romeros, and either Mario or Mauricio Romero had asked him what could be done to help Gutierrez. During their second meeting, Valle told Gutierrez that he had removed criminal charges against Gutierrez and that Gutierrez owed him $20,000 for that action. Unaware that there had been any criminal charges against him, Gutierrez spoke to his attorney about the alleged criminal charges and Valle's demand. After the second meeting, Valle began pressuring Gutierrez for the money. Meanwhile, because he had disclosed Valle's request for payment to his attorney, Gutierrez was taken to a different facility where he met with federal agents. An agent from the Federal Bureau of Investigation ("FBI") later posed as Gutierrez's brother-in-law and gave Valle $20,000. During recorded conversations with the undercover agent, Valle told him that the money was for taking away criminal charges against Gutierrez.

Gutierrez's I-213 showed that he was suspected of involvement in alien smuggling. However, the I-213 noted that an Assistant U.S. Attorney had been contacted about Valle, and the prosecutor had declined prosecution of Valle for alien smuggling. Furthermore, Immigration and Customs Enforcement had declined to interview or prosecute him.

Valle claimed that the $20,000 was for a business debt that Gutierrez owed to Mario Romero. During cross-examination of Gutierrez, defense counsel

showed him an alleged promissory note, and Gutierrez acknowledged that his signature was on the note. The document was not offered into evidence.

At the close of the government's case, Valle moved for a judgment of acquittal. He asserted specific grounds for acquittal of the bribery count, arguing that there was no evidence that Valle would personally receive anything from the deal and that the government failed to show that there were ever criminal charges against Gutierrez. Valle renewed his objection for the same reasons at the close of all evidence. Both motions were denied.

During deliberations, the jury sent a note that read: "We need the following evidence, promissory note for $20,000 dated February the 4th." The district court gave a supplemental instruction to the jury: "Be advised that all the evidence admitted during the trial has been provided to you. Further, the item you requested in jury note Number 1 was not offered into evidence." Valle objected to the second sentence of the instruction, which was overruled. He also requested additional instructions, which were denied.

The jury convicted Valle of both counts. He appeals his convictions, claiming that there was insufficient evidence that he intended to receive something of value in exchange for an official act, and that the jury instruction regarding the alleged promissory note shifted the burden of proof to Valle and deprived him of a fair trial.

## II. DISCUSSION

A.    Bribery

    (1)    Standard of Review and Applicable Law

We review de novo denials of properly-made Federal Rule of Criminal Procedure 29 motions for a judgment of acquittal. United States v. Floyd, 343 F.3d 363, 370 (5th Cir. 2003). In conducting our review to determine if there was sufficient evidence to sustain a conviction, the "relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979).

However, Valle's sufficiency of the evidence claim necessarily involves interpreting the meaning of the bribery statute, and we review questions of statutory interpretation de novo. United States v. Kay, 359 F.3d 738, 742 (5th Cir. 2004).

> The starting point for interpreting a statute is the language of the statute itself. When construing a criminal statute, we must follow the plain and unambiguous meaning of the statutory language. Terms not defined in the statute are interpreted according to their ordinary and natural meaning . . . as well as the overall policies and objectives of the statute.

Id. (internal quotations and footnotes omitted).

The language of the bribery statute at issue, 18 U.S.C. § 201(b)(2)(C), provides:

> [w]hoever . . . being a public official . . . directly or indirectly, corruptly demands, seeks, receives, accepts, or agrees to receive or accept anything of value personally or for any other person or entity, in return for . . . being induced to do or omit to do any act in violation of the official duty of such official or person.

In interpreting this statute, this appeal centers on whether an official must intend to commit the violation of his official duty to be convicted under the statute.

(2)   Analysis

(a)   Statutory Interpretation

We first look to the plain language of the statute for guidance. For a conviction, § 201(b)(2)(C), in relevant part, requires that the official "corruptly demands, seeks, receives, accepts, or agrees to receive or accept anything of value . . . in return for . . . being induced to do or omit to do any act in violation of [his] official duty." By its terms, the statute does not require that the official actually commit the violation of his official duty; it only requires that he demand or agree to accept something of value in return for "being induced" to commit the violation. The statute also clearly requires that the official's demand be "corrupt." Nonetheless, the plain language leaves ambiguity as to whether "being induced" requires that the official intend to commit the violation of his duty when he corruptly demands something of value in return for being induced, or whether it is sufficient that he corruptly demanded the payment while knowing that it was for the purpose of inducing him to violate his duty.

A statute is ambiguous if it is "susceptible to more than one reasonable interpretation or more than one accepted meaning." Kay, 359 F.3d at 743 (internal quotations and footnote omitted). "If, after application of these principles of statutory construction, we conclude that the statute is ambiguous, we may turn to legislative history." Id. Because the statute is susceptible to more than one reasonable interpretation regarding this issue, we turn to its legislative history.

Before 1962, §§ 201–13, relating to bribery and graft, each applied to different categories of persons. S. REP. NO. 87-2213, at 7 (1962), as reprinted in 1962 U.S.C.C.A.N. 3852, 3856. In 1962, these separate sections were revised

and consolidated under one bribery statute, § 201. Id. Analyzing this legislative history, the Second Circuit noted that

> [a] prior statute, 18 U.S.C. § 205 (1958), had required that a Congressman receive the bribe "with the intent to have his action . . . influenced." This . . . left it unclear whether the Congressman must intend to take action or need only intend to receive money with awareness of the purpose for which the briber gives it.
>     The present version, as revised in 1962, deletes "intent" from the description of the conduct specifically proscribed, and instead requires that the overall offense be committed "corruptly." The specific conduct is rephrased as receipt of money in return for "being influenced" in official actions.

United States v. Myers, 692 F.2d 823, 841 (2d Cir. 1982). The House Report on the revised bribery statutes clarified the meaning of the new language. "The language used in subsection ([b])[paragraph (2) of section 201][1] emphasizes that it is the purpose for which the recipient knows the bribe is offered or given when he solicits, receives, or agrees to receive it which is determinative of criminality." H.R. REP. NO. 87-748, at 18 (1961). The report further indicated that this description of the section's intent requirement was consistent with the interpretation held by some courts of at least one of the predecessor bribery statutes. Id. For example, the report cited Whitney v. United States, 99 F.2d 327, 331 (10th Cir. 1938), in which the Tenth Circuit affirmed an official's bribery conviction because "[t]he evidence shows that he not only took but solicited money in connection with [an official act], and whether his action was influenced is immaterial." H.R. REP. NO. 87-748, at 18. The applicable Senate Report did not address the issue, but it noted that § 201(b)(2) "prohibits a public

---

[1] The House Report actually refers to § 201(c). However, § 201 was amended in 1986, redesignating § 201(c) as § 201(b)(2). See Pub. L. No. 99-646, § 46(c) (1986). For clarity, we refer to the current designation of the statutes.

official's solicitation or acceptance of, or agreement to take, a bribe." S. REP. NO. 87-2213, at 8 (1962), as reprinted in 1962 U.S.C.C.A.N. 3852, 3857 (emphasis added).

Valle claimed at oral argument that the Senate Report's language that the 1962 revision "would make no significant changes of substance," id. at 4, as reprinted in 1962 U.S.C.C.A.N. at 3853, is in conflict with the House Report. We disagree. Clearly, the House Report was based on the then-current interpretation of the bribery statutes and did not introduce any change of substance. Furthermore, the full quotation of the portion of the Senate Report on which Valle relies is as follows: "This consolidation would make no significant changes of substance and, more particularly, would not restrict the broad scope of the present bribery statutes as construed by the courts." Id. (emphasis added).

Valle also argued that the Senate Report refers to the intents in § 201(b)(2) as the same as the intents in § 201(b)(1). The actual language of the report is that "[t]he same alternate intents are set forth here [in subsection (b)(2)] as in subsection (b)[(1)]." Id. at 8, as reprinted in 1962 U.S.C.C.A.N. at 3857. This clearly refers to the three alternate intents in the three subparagraphs, § 201(b)(1)(A), (B), and (C), that parallel the three alternate intents in the three subparagraphs, § 201(b)(2)(A), (B), and (C). None of these observations in the Senate Report conflict with the House Report.

This legislative history shows that Congress did not intend for a violation of § 201(b)(2)(C) to turn on whether the official intended to commit a violation of his duty. Instead, it indicates that Congress intended the statute to be violated when an official took the bribe, knowing that it was given for the

purpose of inducing him to violate his official duty, whether or not he actually intended to follow through with the violation.

(b)   Case Law

Because we find no Fifth Circuit case that addresses this issue, we look to the precedent of our sister circuits.  In Myers, the Second Circuit addressed a former congressman's defense to his conviction in the FBI's Abscam investigation that he was "playacting," and, thus, could not be convicted under § 201(b)(2). 692 F.2d at 840.  Relying on the aforementioned House Report, the court determined that "'being influenced' does not describe the [official's] true intent, it describes the intention he conveys to the briber in exchange for the bribe." Id. at 841.  The court further concluded that there was no breach-of-warranty defense to corruption, and "the defense of fraud [was] equally unavailable." Id. at 842.  It held that "[i]f [the defendant] was 'playacting' and giving false promises of assistance to people he believed were offering him money to influence his official actions, he violated [§ 201(b)(2)]." Id.[2]

Another Second Circuit case, United States v. Ford, 435 F.3d 204 (2d Cir. 2006), provides further guidance regarding the proper interpretation of § 201(b)(2)(C).  There, the court distinguished its holding in Myers, analyzing § 201, from the analysis of a bribery conviction under 18 U.S.C. § 666(a)(1)(B). Id. at 213 n.6.  It cited the important textual difference between the two statutes to explain why a district court had erred in reading instructions, likely based upon the Myers opinion, to a jury considering a violation of § 666(a)(1)(B).  Id.

---

[2] In Myers, the language "being influenced" as opposed to "being induced," was at issue. We find no difference between "influenced" and "induced" to suggest that this court reach a different result than the Second Circuit on the basis of this distinction.

"In 1962, Congress revised Section 201(b)(2) to delete explicitly an 'intent to be influenced' element, requiring instead that the 'overall act be committed 'corruptly.' In contrast, under Section 666, 'intending to be influenced' is an explicit element of the crime." Id. (citation omitted).

Valle argues that Second Circuit precedent is trumped by the Supreme Court's decision in United States v. Sun-Diamond Growers, 526 U.S. 398 (1999). In that case, the Court noted that "[b]ribery requires intent 'to influence' an official act or 'to be influenced' in an official act . . . . [F]or bribery there must be a quid pro quo—a specific intent to give or receive something of value in exchange for an official act." Id. at 404–05. The Court further explained that the difference between a bribe under § 201(b) and an illegal gratuity under § 201(c) was that a bribe required a quid pro quo, or influence or inducement upon a public official, whereas an illegal gratuity only required some sort of reward in return for an official act. Id.

We disagree with Valle that Sun-Diamond calls into doubt Myers's persuasive authority. Nothing in Sun-Diamond suggests that a conviction under § 201(b)(2) requires that an official intend to commit an official act, or violation of his duty, when he corruptly enters into a quid pro quo, an agreement to receive something of value in exchange for an official act. In Myers, despite his playacting, the defendant corruptly agreed to receive something of value in exchange for being influenced in an official act. 692 F.2d at 830–31. Furthermore, Myers does not conflict with the Court's holding in Sun-Diamond that, in order to establish a violation of the illegal gratuity statute, "the Government must prove a link between a thing of value conferred upon a public

official and a specific 'official act' for or because of which it was given." 526 U.S. at 414. Myers involved bribery, not an illegal gratuity.

### (c)     Valle's Arguments

In addition to his attempts to suggest that Myers has been called into doubt by Sun-Diamond, Valle claims that (1) there were no criminal charges against Gutierrez and that he never intended to remove the nonexistent charges, and (2) Valle had no ability to remove criminal charges because the El Paso Processing Center handled only administrative aspects of the aliens' detention there.

Valle's first argument is the same playacting claim from Myers, and we conclude that the Second Circuit's decision rejecting the playacting defense to § 201(b)(2) is persuasive. Therefore, we hold that an official may be convicted under § 201(b)(2), if he has corruptly entered into a quid pro quo, knowing that the purpose behind the payment that he has received, or agreed to receive, is to induce or influence him in an official act, even if he has no intention of actually fulfilling his end of the bargain.

However, Valle attempts to distinguish his case from Myers by suggesting that he had no ability to remove criminal charges from any detainee's alien registration files, whereas the defendant in Myers was capable of committing the official acts that he promised. There is no need to consider this argument. Our review of the trial record shows that Valle was capable of violating his duty in the manner that he promised. The violation of Valle's official duty charged in the indictment was "the removal of criminal charges from the official United States Department of Homeland Security records (alien registration file)." Valle was an Immigration and Customs Enforcement agent assigned as a classification

officer with a collateral duty to gather intelligence. He had access to detainees' alien registration files, as well as their detention files, and the authority to gather information on criminal violations, as well as newly discovered criminal charges. From these facts, a rational jury could have inferred that Valle was capable of removing criminal charges from an alien registration file, whether those were past criminal history or pending charges. Therefore, we affirm Valle's conviction for bribery.

B.    Jury Instruction

We review a district court's instructions to a jury for abuse of discretion. United States v. Clayton, 506 F.3d 405, 410 (5th Cir. 2007). "A district court has broad discretion in framing the instructions to the jury and this Court will not reverse unless the instructions taken as a whole do not correctly reflect the issues and law." United States v. McKinney, 53 F.3d 664, 676 (5th Cir. 1995).

Valle claims that the district court's supplemental instruction in response to the jury's note, asking to see the alleged promissory note shown to Gutierrez during cross-examination, implied that Valle had an obligation to offer the note into evidence. He relies on our decision in United States v. Meadows, 598 F.2d 984, 990 (5th Cir. 1979), to argue that the judge was obligated to remind the jury "of the burden and quantum of proof and presumption of innocence . . . ." In Meadows, this court stated: "It is well-established that in giving additional instructions to a jury; particularly in response to inquiries from the jury, a court must be especially careful not to give an unbalanced charge." Id. In United States v. Colatriano, 624 F.2d 686, 690 (5th Cir. 1980), however, this court explained that Meadows does not support the contention that convictions must be automatically reversed when a trial court fails to recharge the jury. "Rather,

12

the trial court's actions must be evaluated in light of the totality of the circumstances, considering the complete instructions given to the jury." Id.

The district court here initially gave thorough, balanced instructions regarding the presumption of innocence and the government's burden of proof to the jury, both orally and in writing. In response to the jury's note, the court's response, particularly the second sentence to which Valle objected, was a direct answer to the jury's request that incorrectly referred to the alleged promissory note as evidence. In light of the balanced initial instructions to the jury and the brevity, neutrality, and accuracy of the supplemental instruction, the district court's decision not to remind the jury of the burden and quantum of proof and presumption of innocence did not result in a prejudicial unbalanced charge, nor did it shift the burden of proof to Valle. See id. Therefore, we hold that the district court did not abuse its discretion as to the supplemental jury instruction.

## III. CONCLUSION

For the foregoing reasons, Valle's convictions are AFFIRMED.


WIENER, Circuit Judge, concurring in part, dissenting in part.

Although I concur in the panel majority's holding that the district court did not abuse its discretion as to the supplemental jury instruction, I must respectfully dissent from the panel majority's affirmance of Valle's bribery conviction. I do so because I am convinced that (1) 18 U.S.C. § 201(b)(2)(C) requires the government to prove beyond a reasonable doubt that the offending government official had the specific intent to provide a quid pro quo, viz., that he actually intended to be influenced in the performance of, or induced to take, an official act in exchange for money, and (2) the government failed to prove that

13

Valle had the required specific intent to remove criminal charges against Gutierrez. I shall demonstrate that (1) it was a legal and factual impossibility for Valle to perform the official act that he "conveyed" to Gutierrez he would perform in consideration for the funds that he solicited and received from Gutierrez, and (2) Valle was aware of this impossibility at all relevant times. This, in turn, made it equally impossible for Valle to have formed the requisite specific intent to commit bribery and thus legally impossible for the government to have borne its burden of proof on the intent element of bribery.

All agree that, to sustain a bribery conviction under § 201(b)(2)(C), the government must prove that the public official "conveyed" to the potential bribe-giver that, in return for money, the officer would perform or refrain from performing a specific act in violation of his official duty. The panel majority would make that the end of the inquiry, at least as far as the public official is concerned. I am convinced that an additional showing is required; namely, that—at the times he agrees to the deal and accepts the funds—the public official must have the specific intent to follow through with the promised act or omission.

I do not dispute the panel majority's conclusion that, when read in a vacuum, the statutory language of § 201(b)(2)(C) is ambiguous. The panel majority correctly observes that the language of the statute does not require that the public official actually commit the violation of his official duty; but neither does it state that the official's mere promise to do or omit a specific act in violation of his official duty in exchange for money is sufficient to sustain a bribery conviction. Accordingly, I agree that, based on the text of § 201(b)(2)(C) alone, it is unclear whether, on the one hand, the offending public official must specifically intend to be induced to perform or not perform an official act as a

quid pro quo for the money, or, on the other hand, it is sufficient that he corruptly demand something of value while merely conveying to the bribe-giver that he would be so induced.

My fundamental disagreement with the panel majority lies in its cursory dismissal of the pellucid pronouncements of the Supreme Court in Sun-Diamond regarding the public official's required specific intent to receive something of value as consideration for performing or not performing an official act that constitutes a quid pro quo for the money. Even though Sun-Diamond was a gratuity case, the Supreme Court saw fit to address the subject bribery statute in detail, stating that "[b]ribery requires intent 'to influence' an official act [the bribe-giver] or 'to be influenced' in an official act [the public official/bribe-receiver] . . . . In other words, for bribery there must be a quid pro quo—a specific intent to give or receive something of value in exchange for an official act."[3] Inasmuch as the Supreme Court plainly stated that bribery under § 201(b)(2) requires that the public official intend to be influenced in an official act—and I cannot discern any material difference between Congress's use of "influenced" in § 201(b)(2)(A) and its use of "induced" in § 201(b)(2)(C)—I must take issue with the panel majority's statement that "[n]othing in Sun-Diamond suggests that a conviction under § 201(b)(2) requires that an official intend to commit an official act, or violation of his duty . . . ." For, Sun-Diamond does not merely suggest that the public official's specific intent is required under § 201(b)(2)(C); it fundamentally alters the statutory framework to make such intent an element of the crime. Sun-Diamond, in effect, judicially amended § 201(b)(2)(C), removing any ambiguity regarding the requisite showing of the

---

[3] United States v. Sun-Diamond Growers, 526 U.S. 398, 404-05 (1999).

public official's intent and thereby proscribing the panel majority's resort to legislative history.

Furthermore, Myers and the subject case are factually distinguishable and at least partially reconcilable: The Congressman in Myers had the legal authority and actual ability to take the official action that he conveyed to the bribe-giver the intention to take and for which the Congressman received the money; in stark contrast, Valle possessed neither the legal means nor the actual ability to dismiss criminal charges against Gutierrez, regardless of having conveyed his intention to do so to Gutierrez. This is because, factually, there were no charges either pending against Gutierrez or being contemplated when Valle made his promise; and, legally, Valle did not even work in the criminal arena. Accordingly, Valle had no legal authority or actual ability to remove the putative charges. It is apparent, then, that, in contrast to the Congressman in Myers, Valle could not possibly have formed the requisite specific intent to be influenced in, or induced to take, the official act that he conveyed to Gutierrez would be taken. Absent both the actual and legal ability to deliver on his promise, Valle could never have specifically intended to deliver the quid pro quo required by Sun-Diamond as consideration for the money he sought and received from Gutierrez.

Given these material distinctions between this case and Myers, together with the fact that Myers preceded Sun-Diamond by almost twenty years, we would not create a circuit split with the Second Circuit by reaching the result I advocate. In Myers, all that the Second Circuit did was to reject self-serving, purely subjective and unsupported statements by the Congressman that he never had the intention to perform the quid pro quo for the money. In so doing,

the Myers Court relied on the fact that the Congressman was actually and legally able to perform the conveyed official act if he had so chosen. Both the Congressman in Myers and Valle here conveyed to the bribe-givers what they, as officials, would do for the money; and, like the Second Circuit, we may totally disregard Valle's self-serving, subjective statement about collecting a debt that Gutierrez owed to a third party. The significant difference that distinguishes this case from Myers—and avoids a circuit split—is that the Congressman was legally and actually able to do what he promised, but Valle was not.

The panel majority nevertheless posits that Valle was capable of violating his duty in the manner that he promised because of his status as a classification officer with Immigration and Customs Enforcement, which afforded him access to alien registration and detention files and provided him with the authority to gather intelligence concerning possible criminal violations. As noted above, I respectfully reject the panel majority's assertion that these facts vested Valle with the legal authority to remove criminal charges, especially considering that the El Paso Processing Center, where he worked, handled only administrative aspects of the aliens' detention.

This point of dispute need not be resolved, however, because it was factually impossible for Valle to remove criminal charges against Gutierrez for the obvious reason that no charges were ever filed and none were even contemplated! As noted by the panel majority, before Valle ever proposed the transaction, the Assistant U.S. Attorney had declined to bring charges against Gutierrez for alien smuggling. Inasmuch as (1) there were no charges pending or even contemplated against Gutierrez, and (2) Valle was fully aware that no charges were pending or would ever be brought, it was impossible for him to

have formed the requisite specific intent to be influenced in, or induced to take, a specific act, viz., removal of criminal charges, in violation of his official duty. Stated differently, it was an objectively logical impossibility for Valle to have formed the specific intent to deliver on his part of Sun-Diamond's indispensable element of a quid pro quo.

In dissenting, I do not question—and in fact advocate—the importance and necessity of using objective indicia to determine the public official's subjective intent; and I acknowledge that, in most circumstances, the official's conveyed intention and his legal and actual authority to do or omit an act will coincide to support a finding of specific intent. The discrete circumstances of Valle's case are exceptional, however: The record plainly eliminates any doubt about whether there were charges pending or under consideration against Gutierrez at the time Valle promised to remove them. Rather than speculate as to whether it was plausible that charges against Gutierrez could be filed in the future and that Valle's promise actually pertained to the removal of these potential charges, the correct course of action is to evaluate the objective realities at the time or times that Valle conveyed his intention to remove the putative charges and accepted the money from Gutierrez. This evidence shows that, irrespective of Valle's legal authority, he could not conceivably have formed the requisite specific intent, per Sun-Diamond, to remove criminal charges against Gutierrez and violate any of his official duties as a classification officer.

Finally, I briefly address the Seventh Circuit's decision in United States v. Arroyo,[4] which—like the Second Circuit's decision in Myers—was rendered approximately twenty years before Sun-Diamond. In Arroyo, the defendants

---

[4] 581 F.2d 649 (7th Cir. 1978).

(who were public officials) sought to extort money from an applicant for a federal loan, by representing that they were still processing his application when in fact they had already approved it. The defendants challenged their bribery convictions under § 201 based on the fact that their corrupt solicitation occurred after they had already performed their official actions. They argued that they could not have formed the specific intent to be influenced in, or induced to take, an official act that had already been performed. A panel majority of the Seventh Circuit rejected their defense and held—based on its interpretation of the statutory language of § 201—that the statute was not limited to solicitations occurring before the actual performance of an official act. The dissent, however, concluded that § 201 requires that a public official specifically intend to permit himself to be influenced in an official act. Moreover, reasoned the dissent, defendant Arroyo could not possibly have had the requisite intent necessary for a conviction because his part in the decision-making process had been completed by the time the corrupt solicitation was made. The government would liken the instant case to Arroyo because the panel majority in that case effectively rejected the defendants' impossibility defense and focused only on whether the public official's demand was made corruptly, rather than also considering whether the official actually intended to be influenced in the performance of an official act. When Arroyo is viewed in the light of the Supreme Court's superseding pronouncements in Sun-Diamond regarding the public official's requisite specific intent actually to deliver a quid pro quo, which pronouncements judicially amended § 201, the panel majority's decision in Arroyo is plainly obsolete and thus inapposite.

The proof of the pudding lies in the contrast between the two crimes for which Valle was convicted—bribery and extortion. Valle's actions were no doubt criminal, and—on precisely the same set of facts—he was appropriately convicted of extortion under 18 U.S.C. § 872. But, the difference in the intent elements of bribery and extortion is precisely what makes Valle's conviction for extortion proper and his bribery conviction reversible error. Simply put, the government overreached in charging Valle with bribery under § 201(b)(2)(C), as the evidence was plainly insufficient to prove beyond a reasonable doubt that he had the specific intent to be influenced in the performance of, or induced to do or omit, an official act that was actually and legally impossible for him to perform, and thus legally impossible for him to intend to perform. This is why I must respectfully dissent in part.