UNITED STATES of America,
Plaintiff-Appellee,

v.

Manuel ACOSTA, Bobby Ray Weempe, Trinidad Aranda, Maria Aranda, Clarence Reynolds, Frankie Cooper, Billy Mel Alford, Donna Alford and Herbert Arney, Defendants-Appellants.

No. 84–1205.

United States Court of Appeals,
Fifth Circuit.

June 6, 1985.

Max Christenson, Odessa, Tex., (court-appointed), for Bobby Weempe.

Vince D'Angelo, Albuquerque, N.M., for Trinidad Aranda & Maria Aranda & Manuel Acosta.

Clarence Reynolds, pro se.

James H. Anderson, Dallas, Tex., for Clarence Reynolds.

Lucien B. Campbell, Federal Public Defender, Kevin E. Shannon, Asst. Federal Public Defender, El Paso, Tex., for Frankie Cooper.

James H. Anderson, Dallas, Tex., for Reynolds, Billy Mel Alford, Herbert Arney and Donna Alford.

Mervyn Hamburg, Atty., Dept. of Justice, Washington, D.C., plaintiff-appellee.

Before GOLDBERG, RUBIN and HILL, Circuit Judges.

ROBERT MADDEN HILL, Circuit Judge:

The appellants comprise nine of sixteen defendants convicted in the federal district court in the Western District of Texas on one or more counts of an eleven-count indictment. Count 1 charged all defendants with conspiracy to possess in excess of 1000 pounds of marijuana with intent to distribute in violation of 21 U.S.C. § 846 and Counts 2 through 11 charged various combinations [1] of the alleged coconspirators with possession of marijuana with intent to distribute in violation of 21 U.S.C. § 841(a)(1).

---

1. All of the substantive counts involved numerous defendants except count 4 in which only Billy Mel Alford was named.

The following issues have been raised on appeal by several of the appellants: (1) error by the trial court in not submitting the entire charge to the jury in writing; (2) error by the trial court in denying a *James* hearing and in admitting hearsay evidence prior to the establishment of a conspiracy; (3) insufficient evidence as to the substantive counts; and (4) insufficient evidence as to the conspiracy count. Additionally, individual appellants have raised the following issues: (1) error in admitting into evidence a remote prior conviction (Herbert Arney); and (2) error in denying a motion for severance (Manuel Acosta).

For the reasons discussed in the opinion, we reverse the convictions of Donna Alford on counts 5 and 6, and of Bobby Ray Weempe and Clarence Reynolds on count 8; we vacate the conviction of Herbert Arney on count 1 and remand for an on-the-record determination of admissibility of a remote conviction and we affirm the remaining convictions.

## BACKGROUND

The indictment concerned various trips from the Dallas, Texas, area to the Big Bend Park area of Texas near the Mexican border to obtain large quantities of marijuana and bring it back to the Dallas area for packaging and distribution. Typically, a man and a woman would travel together in a motor home or recreational vehicle allegedly to give the appearance of a vacationing couple. They would be met by other named coconspirators and Spanish-speaking individuals who would load the vehicle with large trash bags full of marijuana. The alleged "mastermind" of the conspiracy, Billy Mel Alford, would pay the couple for driving the vehicle. Some individuals named as coconspirators participated only at one or the other end of the operations. Four members of the conspiracy testified for the government as its principal witnesses: Carol Gordon, Robert Bearden, Sandra Buck and Sheldon Barnum. All of these witnesses had been involved in the driving of the motor vehicle phase of the operations, thus coming into contact with the other conspirators in both Dallas and the Big Bend Park area.

The specific substantive counts involved trips made by the individuals listed in parentheses *infra:* on or about October 31, 1980, (count 2) (Bearden and Buck); on or about November 30, 1980 (count 3) (Bearden, Buck, and Sandra Hallett); on or about June 9, 1982 (count 4) (Bobby Ray Weempe arrested while driving a Winnebago loaded with 1315 pounds of marijuana); on or about July 1, 1982 (count 5) (Barnum and Hallett); on or about July 15, 1982 (count 6) (Barnum and Hallett driving to Big Bend Park); (Barnum and Melinda Altman driving back to Dallas); on or about August 13, 1982 (count 7) (Barnum and Donna Alford's younger sister); on or about September 17, 1982 (count 8) (Barnum and Buck); in October 1982 (count 9) (Barnum and Buck); on or about December 21, 1982 (count 10) (Fred and Carol Gordon with Frankie Cooper assisting in the vehicle's repair en route); on or about January 22, 1983 (count 11) (Fred and Carol Gordon accompanied by Jose Lozano who was instructed to stay out of sight in the Big Bend Park area).

The details of these trips are set out in full in the opinion when relevant to the issues raised on appeal. Additionally, other events which transpired as part of the conspiracy but did not result in substantive counts in the indictment were described in the evidence and are described in detail in the opinion when needed to resolve the issues on appeal.

## ANALYSIS

### I. JURY CHARGE

The charge to the jury was given orally by the district court. Appellants Clarence Reynolds, Billy Mel Alford, Donna Alford, and Herbert Arney contend that the trial court abused its discretion in denying the defendants' motion requesting that the entire charge to the jury be submitted to the jury *in writing* given that a portion of the charge was submitted to the jury as writ-

ten answers to two questions from the jury during its deliberations.

The jury's two inquiries were:

Would you define again what is the definition of "constructive possession" in regard to the counts in the "Western District of Texas" when some of those indicted were arrested for allegedly carrying out illegal acts in the Dallas area?

and

Does a person have to have either actual or constructive possession of an illegal

**2.** The portion of the charge to the jury concerning constructive possession in the court's written answer was given as follows:

THE LAW RECOGNIZES TWO KINDS OF POSSESSION: ACTUAL POSSESSION AND CONSTRUCTIVE POSSESSION. A PERSON WHO KNOWINGLY HAS DIRECT PHYSICAL CONTROL OVER A THING, AT A GIVEN TIME, IS THEN IN ACTUAL POSSESSION OF IT.

A PERSON WHO, ALTHOUGH NOT IN ACTUAL POSSESSION, KNOWINGLY HAS BOTH THE POWER AND THE INTENTION, AT A GIVEN TIME, TO EXERCISE DOMINION OR CONTROL OVER A THING, EITHER DIRECTLY OR THROUGH ANOTHER PERSON OR PERSONS, IS THEN IN CONSTRUCTIVE POSSESSION OF IT.

THE LAW RECOGNIZES ALSO THAT POSSESSION MAY BE SOLE OR JOINT. IF ONE PERSON ALONE HAS ACTUAL OR CONSTRUCTIVE POSSESSION OF A THING, POSSESSION IS SOLE. IF TWO OR MORE PERSONS SHARE ACTUAL OR CONSTRUCTIVE POSSESSION OF A THING, POSSESSION IS JOINT.

YOU MAY FIND THAT THE ELEMENT OF POSSESSION AS THAT TERM IS USED IN THESE INSTRUCTIONS IS PRESENT IF YOU FIND BEYOND A REASONABLE DOUBT THAT THE DEFENDANT HAD ACTUAL OR CONSTRUCTIVE POSSESSION, EITHER ALONE OR JOINTLY WITH OTHERS. YOU ARE FURTHER INSTRUCTED THAT: IN ORDER FOR THE OFFENSES OF POSSESSION OF MARIJUANA WITH THE INTENT TO DISTRIBUTE AS ALLEGED IN COUNTS TWO THROUGH ELEVEN IN THE INDICTMENT, AS TO ANY DEFENDANT, THE GOVERNMENT MUST HAVE ESTABLISHED BEYOND A REASONABLE DOUBT THAT:

FIRST: THAT THE ACCUSED KNOWINGLY AND WILLFULLY POSSESSED THE MARIJUANA AS ALLEGED IN THE INDICTMENT; AND

SECOND: THAT THE ACCUSED POSSESSED THE MARIJUANA WITH THE INTENT TO DISTRIBUTE IT.

amount of marijuana to be charged with conspiracy to transfer, possess and distribute marijuana?

Appellants urge that the particular written answers repeating portions of the oral charge that were received by the jury were heavily weighted towards the government's position, and that in view of the complexity of the issues of conspiracy and constructive possession, the jury should have had before it *all* of the charge in writing as to those issues in order to consider the charge as a whole [2] and to avoid confusion by the jury

Appellants argue that in particular the court omitted the following principles:

(1) as to the possession counts, only the evidence pertaining to that offense and to that defendant is to be considered;

(2) proof of specific intent is required;

(3) that the defendant is not on trial for any act or conduct not alleged in the indictment.

Appellants also assert the definition of the following terms should have been included in response to the jury's inquiry: intent, knowledge, and willfully.

As to the conspiracy question from the jury, the court gave the following instructions from the charge to the jury:

TITLE 21, UNITED STATES CODE, SECTION 841(A)(1), AS USED IN ALL OF THE COUNTS OF THE INDICTMENT, PROVIDES IN PERTINANT [sic] PART THAT:

IT SHALL BE UNLAWFUL FOR ANY PERSON KNOWINGLY AND INTENTIONALLY ... TO ... POSSESS WITH INTENT TO ... DISTRIBUTE, A CONTROLLED SUBSTANCE
. . . .

YOU ARE INSTRUCTED THAT MARIJUANA, THE SUBSTANCE STATED IN THE INDICTMENT IS A CONTROLLED SUBSTANCE WITHIN THE MEANING OF THIS LAW.

YOU ARE FURTHER INSTRUCTED THAT 'TO POSSESS WITH INTENT TO DISTRIBUTE' SIMPLY MEANS TO POSSESS WITH INTENT TO DELIVER OR TRANSFER POSSESSION OF A CONTROLLED SUBSTANCE TO ANOTHER PERSON WITH, OR WITHOUT ANY FINANCIAL INTEREST IN THE TRANSACTION.

IN LIGHT OF THE ABOVE INSTRUCTIONS, IN ORDER FOR THE OFFENSES OF CONSPIRACY TO POSSESS MARIJUANA WITH THE INTENT TO DISTRIBUTE IT, AS ALLEGED IN COUNT NUMBER ONE OF THE INDICTMENT, AS TO ANY DEFENDANT, THE GOVERNMENT *MUST* HAVE ESTABLISHED BEYOND A REASONABLE DOUBT:

FIRST: THAT THE CONSPIRACY DESCRIBED WAS FORMED AND EXISTING AT

and prejudice to the defendants. Appellants further contend that the court erred in failing to remind the jury of the burden and quantum of proof and of the presumption of innocence, and that it took no other measures to avoid prejudice to the defendants.[3]

Whether or not to use a written charge and whether or not to reply to a jury's request for additional instructions are both matters properly determined by the sound discretion of the trial judge. *See United States v. Neiss,* 684 F.2d 570, 572 (8th Cir.1982); *Stephens v. United States,* 347 F.2d 722, 725 (5th Cir.), *cert. denied,* 382 U.S. 932, 86 S.Ct. 324, 15 L.Ed.2d 343 (1965). Thus, there is no error in the district court's refusal to submit a written charge, unless in the totality of the circumstances of the case the written response to the jury's inquiries created an unbalanced charge prejudicial to the defendants. *See United States v. Arrendondo-Morales,* 624 F.2d 681, 690 (5th Cir.1980). As a general principle, it is proper for a trial judge to limit reinstruction to the specific request made by a jury. *See, e.g., United States v. Shaw,* 701 F.2d 367, 395 (5th Cir.1983),

*cert. denied,* —— U.S. ——, 104 S.Ct. 1419, 79 L.Ed.2d 744 (1984) (upholding the trial court's reinstruction on premeditation and the omission of an instruction on malice aforethought, applicable to both first and second degree murder, when the jury's request was for an explanation of the difference between the two types of murder); *Neiss,* 684 F.2d at 572 (upholding the trial court's refusal to include a self-defense instruction in a supplemental charge on second degree murder, malice, and manslaughter). *But see United States v. Meadows,* 598 F.2d 984, 987–88 (5th Cir.1979) (omission of any reference to intent in reinstructing on fraud was found to be highly prejudicial and to constitute reversible error). In *Meadows,* the omitted instruction may be viewed as necessarily an integral part of the issue concerning which the jury requested clarification. The government has argued in the present case that the district court was merely responsive to the specific inquiries of the jury in not giving more complete supplementary instructions.

Appellants have claimed that the limitation favored the government's theory

---

OR ABOUT THE TIME ALLEGED IN THE INDICTMENT; AND
SECOND: THAT THE ACCUSED KNOWINGLY AND WILLFULLY BECAME A MEMBER OF THE CONSPIRACY TO POSSESS WITH THE INTENT TO DISTRIBUTE THE QUANTITY OF MARIJUANA ALLEGED IN THE INDICTMENT.
IN LIGHT OF THE ABOVE INSTRUCTIONS–IN ORDER FOR THE OFFENSES OF POSSESSION OF MARIJUANA WITH THE INTENT TO DISTRIBUTE AS ALLEGED IN COUNTS TWO THROUGH ELEVEN IN THE INDICTMENT, AS TO ANY DEFENDANT, THE GOVERNMENT *MUST* HAVE ESTABLISHED BEYOND A REASONABLE DOUBT THAT:
FIRST: THAT THE ACCUSED KNOWINGLY AND WILLFULLY POSSESSED THE MARIJUANA AS ALLEGED IN THE INDICTMENT; AND
SECOND: THAT THE ACCUSED POSSESSED THE MARIJUANA WITH THE INTENT TO DISTRIBUTE IT.
Appellants urge that the following principles and definitions were omitted:
(1) A person who has no knowledge of a conspiracy but acts in a way which furthers it does not become a [coconspirator];

(2) To become a member [of] a conspiracy, a defendant must willfully participate with intent to advance or further some object or purpose of the conspiracy;
(3) Definition of willfully;
(4) Mere presence at the scene or similarity of conduct does not establish proof of the existence of a conspiracy;
(5) In determining whether a particular defendant was a member of the conspiracy consider only his or her acts and statements;
(6) Only consider statements made or acts done by any [coconspirator] if such statement or acts were knowingly made and done during the continuance of such conspiracy or in furtherance of the conspiracy;
(7) Proof of several conspiracies is not proof of the single overall conspiracy;
(8) If the defendant is a member of another conspiracy and not the one charged with in the indictment you must acquit.

3. In answering the first inquiry the court reminded the jury that they "must follow all of [its] instructions as a whole" and that they had "no right to disregard or give special intention to any one instruction." The appellants take issue with the fact that even this admonition was not repeated by the court in replying to the second inquiry a day later.

of the case. In response to that very allegation, this Court has noted that "there is no error if the trial judge in supplemental instructions charges exactly as he was requested." *United States v. Chatham*, 568 F.2d 445, 451 n. 10 (5th Cir.1978) (citations omitted). Thus, the district court did not commit error *per se* by limiting its reinstructions to the specific inquiries of the jury.

■ However, the question remains whether the reinstruction created an unbalanced impression of the law to the jury that was prejudicial to the appellants. This Court has expressed its concern about the dangers of incomplete supplemental instructions as follows:

> In giving additional instructions to a jury—particularly in response to inquiries from the jury—the court should be especially careful not to give an unbalanced charge. If the Judge chooses to give any additional charge and elects not to repeat the entire original charge, he should remind the jury of the burden and quantum of proof and presumption of innocence *or* remind them that all instructions must be considered as a whole *or* take other appropriate steps to avoid any possibility of prejudice to the defendant.

*United States v. Sutherland*, 428 F.2d 1152, 1158 (5th Cir.1970) (emphasis added). Appellants have vigorously asserted that the district court met none of the alternatives for avoiding prejudice. We find, however, that the district court did take measures to avoid prejudice, specifically by reminding the jury in response to its first inquiry that *all* of the court's instructions were to be followed. The fact that the next day the jury made another specific inquiry could be interpreted as indicating that the jury was mindful of the court's admonition to consider the entire charge: the jury requested further instructions on an issue concerning which it may not have clearly recalled the original instructions.

There is no indication from the specific inquiries of the jury and the responses of the court that the jury verdict was reached based on an unbalanced charge. The court's reinstructions were responsive to the questions raised. The court did not omit any essential components of the definition of constructive possession and of the proof necessary for conspiracy to possess. The additional instructions urged on appeal as necessary to balance the supplemental charge are peripheral to the relatively narrow issues upon which the jury was reinstructed. These additional instructions were not requested by the appellants at trial. There they requested the entire charge to be resubmitted in written form. We find no abuse of discretion in the court's denial of that request nor in the way in which it responded to the jury's inquiries.

We note, however, that the danger of an unbalanced charge is enhanced by the practice of giving initial instructions only orally, but responding in writing at the time of reinstruction. While we would discourage this practice, for the reasons given earlier, in the totality of the circumstances of this case, we find no abuse of discretion here.

## II. JAMES HEARING

Appellants have raised the issue of the denial of a preliminary *James* hearing and the subsequent allegedly erroneous admission of hearsay evidence prior to the establishment of a conspiracy. *See United States v. James*, 590 F.2d 575 (5th Cir.) (en banc), *cert. denied*, 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979); Fed.R.Evid. 801(d)(2).

This Court has established procedures and standards for the admissibility of coconspirator statements congruent with the Federal Rules of Evidence. *James*, 590 F.2d at 578. First, "[t]he district court should, whenever reasonably practicable, require the showing of a conspiracy and of the connection of the defendant with it before admitting declarations of a coconspirator." *Id.* at 582. The standard for admission is the existence of *"substantial, independent* evidence of a conspiracy, at least enough to take the question to the jury." *Id.* at 580–81 (emphasis in original)

(quoting *United States v. Nixon*, 418 U.S. 683, 701 n. 14, 94 S.Ct. 3090, 3104 n. 14, 41 L.Ed.2d 1039 (1974)). However, if the district court "determines that it is not reasonably practical to require the showing to be made before admitting the evidence, the court may admit the statement subject to it being connected up." *Id.* at 582. The second stage of inquiry at the conclusion of the evidence has a higher standard: a preponderance of the evidence. *Id.* at 581.

[O]n appropriate motion at the conclusion of all the evidence the court must determine as a factual matter whether the prosecution has shown by a preponderance of the evidence independent of the [coconspirator's statement] (1) that a conspiracy existed, (2) that the coconspirator and the defendant against whom the conspirator's statement is offered were members of the conspiracy, and (3) that the statement was made during the course and in furtherance of the conspiracy. Rule 801(d)(2)(E). If the court concludes that the prosecution has not met its burden of proof on these issues, the statement cannot remain in the evidence to be submitted to the jury.

*Id.* at 582.

■ In the present case, the district court refused all requests for a *James* hearing prior to and during the trial, and explained at the close of the government's case why it considered it not practical to have held a *James* hearing. The court then reiterated the *James* requirements themselves as its factual finding that they had been met.[4] We find no error in the procedure adopted by the trial court in this case.

First, there is no indication that the trial court abused its discretion in deciding to admit the hearsay statements subject to later connection. *See United States v. Winship*, 724 F.2d 1116, 1121 (5th Cir. 1984). In *Winship*, the *James* requirements are described as follows: "the spirit of *James* can be carried out without baggaging it with rigidities and inflexibilities, so long as the judge and the participants in the trial keep in mind that there must be independent evidence of the crime aside from the hearsay testimony." *Id.*

■ Second, the trial court's "failure to articulate findings" as to *James* has been held not to constitute reversible error. *Id.* at 1121–22. Whether the finding that there was independent evidence—although not supported by subsidiary findings of such evidence—is supported by the record is to be reviewed under the clearly erroneous standard. *Id.* at 1122.

■ The hearsay statements admitted against Manuel Acosta will be reviewed with specificity. The other appellants have not challenged the trial court's ruling with specificity. Acosta has objected specifically to the following testimony against him by the government's witness, and alleged coconspirator, Robert Beardon:

Q. Prior to going down there on this occasion, did you have any conversation with Mr. Alford as to the purpose of going down there?

**4.** The court's exact ruling follows:

[A]s far as the James case is concerned, of course, the Court is, it is perfectly obvious to the Court, that this is exactly the type of case that the Fifth Circuit had in mind, that if we had to have a separate independent hearing insofar, as the conspiracy is concerned, we in effect would be trying this lawsuit two times. It would be at great expense and trouble to the Government to get all these witnesses from Dallas, the Big Bend Park, every other place here just to hear them. We have too many speedy trial problems, we have too many defendants, we have too many cases pending to afford the luxury of two independent hearings.

I determined, for the purposes of the record—you can make a note of this—that the factual matters that the prosecution has presented during the course of this trial, there has been shown by a preponderance of the evidence, such evidence being substantial and independent of the conspirators statements themselves, one, that a conspiracy did in fact exist; two, that the conspirators and the defendants against whom the statements are offered were members of the conspiracy; and three, that the statements were made in the course and in the furtherance of the conspiracy.

Now, that ruling has been made, made outside the presence of the jury. That is my finding.

A. Yes, sir.

Q. And what is the substance of those conversations with Mr. Alford?

A. That we was going down there to meet a connection and bring back a load of marijuana.

Q. Okay. Meet a connection? Had you been down there before?

A. No, sir.

Q. Did Mr. Alford say he had been done there before?

A. No sir. Just he told me it was his first time.

Q. Okay. Did he tell you how he had gotten this connection?

A. He told me that he paid this guy who all I know him by is Clay, $5,000.00 to introduce him.

Q. To who?

A. To Manuel Acosta.

Q. Mr. Acosta?

A. Yes, sir.

Q. I believe you earlier identified Mr. Acosta?

A. Yes, sir.

For this testimony to be admissible under the coconspirator hearsay exception, the government must have established by a preponderance of the evidence independent of the coconspirator's testimony (1) that a conspiracy existed, (2) that the coconspirator and Acosta were members of the conspiracy, and (3) that the statement was made during the course and in furtherance of the conspiracy. *See James*, 590 F.2d at 582; Fed.R.Evid. 801(d)(2)(E). We find from our examination of the record that the trial court's finding that there was sufficient independent evidence implicating Manuel Acosta to permit the introduction of the challenged hearsay statements was

not clearly erroneous, and further that all of the *James* requirements were met.

As to the other appellants, we have already determined that the district court did not commit reversible error by not holding a *James* hearing or by not making its findings concerning the *James* requirements with greater specificity. Because none of the other appellants have identified on appeal the particular hearsay statements they allege to have been erroneously admitted, we decline to *sua sponte* search the record for the possible statements to which they might have objected. In essence, by failing to make their arguments with specificity, they have waived their right to any further consideration of them by this Court on appeal.

Accordingly, we find no reversible error in the district court's rulings under *James*.

## III. SUBSTANTIVE COUNTS

### A. *Donna Alford*

Donna Alford, Billy Mel Alford's wife, was convicted of conspiracy and three of the substantive counts (3, 5, and 6). The government concedes the insufficiency of evidence as to count 5. Accordingly, we reverse the conviction of Donna Alford on count 5.[5]

■ As to count 3, Donna Alford alleges that the government did not prove that she was in the Western District of Texas on or about November 30, 1980, as charged in the indictment. The government's original response on appeal was that its theory of prosecution on count 3 was that Donna Alford was an aider and abettor who at times accompanied her husband to Big Bend Park to give the outward impression of a vacationing couple.[6] The government agrees that there is no evidence of her

---

5. The government conceded the insufficiency of the evidence to convict Donna Alford on count 5 both in its original appellate brief and at oral argument. In a supplemental brief requested by the court on the *Pinkerton* principle raised for the first time during oral argument as an alternate theory to the aider and abettor theory originally presented by the government with respect to count 3, the government belatedly urged this Court to sustain Donna Alford's con-

victions on *all* substantive counts. This we decline to do in view of the government's clear acknowledgement of insufficient evidence to convict Donna Alford on count 5.

6. In none of the substantive counts in the indictment were Donna and Billy Alford the couple driving the motor home.

participation in the loading activities at Big Bend Park in the Western District of Texas, but argues that there was evidence that later when the marijuana was brought back to Dallas she helped to package it into one-pound bundles.

Alford is correct in asserting that "[v]enue is an element of any offense; the prosecution always bears the burden of proving that the trial is in the same district as the crime's commission." *Winship*, 724 F.2d at 1124. However, the rule differs for conspirators and aiders and abettors such that:

> Venue is proper in conspiracy offenses in any district where the agreement was formed or an overt act occurred.... As with conspirators, whether an aider and abettor has ever before been in the district of the trial is not necessarily determinative of proper venue. Aiding and abetting crimes may be tried in the district where the principal committed the substantive crimes.

*Id.* at 1125. However, the government's reliance on the aider and abettor theory is misplaced in view of the fact that no jury instruction was given on that theory. *See United States v. Wilson*, 657 F.2d 755, 762–63 (5th Cir.1981), *cert. denied*, 455 U.S. 951, 102 S.Ct. 1456, 71 L.Ed.2d 667 (1982). Therefore, Donna Alford's conviction on count 3 cannot be sustained on the aiding and abetting exception to the requirement to prove venue as an essential element of any offense.

At oral argument, the government urged the application of the *Pinkerton* principle to sustain the conviction of Donna Alford on count 3. *See supra* note 5. This Court has described the applicability and rationale of the *Pinkerton* principle as follows:

> Well settled is the principle that a party to a continuing conspiracy may be responsible for a substantive offense committed by a coconspirator in furtherance of the conspiracy, even though that party does not participate in the substantive offense or have any knowledge of it. *Pinkerton v. United States*, 328 U.S. 640, 647, 66 S.Ct. 1180 [1184], 90 L.Ed. 1489 (1946). Once the conspiracy and a particular defendant's knowing participation in it has been established beyond a reasonable doubt, the defendant is deemed guilty of substantive acts committed in furtherance of the conspiracy by any of his criminal partners.... This principle has been repeatedly applied by this circuit in cases involving drug conspiracies and substantive drug violations.... The *Pinkerton* vicarious-liability rationale is based upon an agreement or common purpose shared by coconspirators; they are partners in crime, and the act of one in furtherance of the unlawful plan is the act of all. *Pinkerton v. United States*, 328 U.S. at 646–47 [66 S.Ct. at 1183–84].

*United States v. Michel*, 588 F.2d 986, 999 (5th Cir.), *cert. denied*, 444 U.S. 825, 100 S.Ct. 47, 62 L.Ed.2d 32 (1979). Thus, the *Pinkerton* principle may be applied to sustain Donna Alford's conviction on count 3 without her actual participation in the transaction in the Western District of Texas as long as the jury charge fairly presented the principle to the jury. *Id.* at 999, n. 13. The government contends that the jury instruction did fairly express the *Pinkerton* principle; our examination of the instruction [7] convinces us as well that it

**7.** The court's instruction to the jury clearly incorporated the *Pinkerton* principle, to wit:

> In determining whether a conspiracy existed, you should consider the actions and declarations of all of the alleged participants. However, in determining whether a particular defendant was a member of the conspiracy, if any, you should consider only his or her acts and statements. He or she cannot be blamed by the acts or declarations of other participants until it is established that a conspiracy

> existed, and that he or she was one of its members.
>
> Whenever it appears beyond a reasonable doubt from the evidence in the case that a conspiracy existed, and that a defendant was one of the members, then the statements knowingly made thereafter and the acts knowingly done thereafter, by any person likewise found to be a member, may be considered by the jury as evidence in the case as to any defendant found to have been a member, even though the statements and acts may

did. *See id.* Therefore, we affirm Donna Alford's conviction on count 3.

■ As to count 6, Donna Alford argues that the evidence presented as to that count failed to demonstrate that she had any dominion or control over any marijuana in the Western District of Texas, and that her husband's presence during the loading of the marijuana on that occasion established nothing as to her knowledge or participation. Sheldon Barnum was the government's only witness concerning the count 6 transaction. He mentioned dropping off both Donna and Billy Alford at the Odessa, Texas, airport (which is near the Big Bend Park area) where the Alfords got into a pick-up truck. He then testified about loading the marijuana into a Winnebago with Billy Alford, Jose Lozano, Melinda Altman and Manuel Acosta. No evidence was introduced that Donna Alford was present at the loading in the Big Bend Park area or at the unloading at Billy Alford's Cedar Creek Lake house near Dallas. Unloading was accomplished by Barnum, Billy Alford, Lozano and Bobby Weempe. No testimony concerning any packaging by Donna Alford was presented with respect to this transaction. Thus, Donna Alford's only association with this transaction is having been in the company of her husband on the drive to the Big Bend Park area. This evidence cannot sustain a conviction for possession with intent to distribute even on an aiding and abetting theory. The government has shown only mere presence and association. *See, e.g., United States v. Forrest,* 620 F.2d 446, 451 (5th Cir.1980). Even if the evidence were sufficient to sustain the conviction on the aiding and abetting theory, that theory is not applicable in this case because, as discussed *supra* with respect to count 3, no instruction was given on that theory. *See Wilson,* 657 F.2d at 762–63. Also, the aiding and abetting theory is not needed to overcome a lack of proof of venue as to count 6 because Donna Alford was proven to have

been present in the Western District of Texas at the time alleged in the indictment.

Further, the government did not seek to apply the *Pinkerton* principle to count 6 until its post-argument supplemental brief in which it urged that the principle be used to sustain *all* of Donna Alford's substantive count convictions. We decline to apply the *Pinkerton* principle to this count which was not even originally argued on the aiding and abetting theory. Therefore, finding there to be insufficient evidence to sustain the conviction, we reverse the conviction of Donna Alford on count 6. *See Forrest,* 620 F.2d at 451.

### B. *Clarence Reynolds*

■ Clarence Reynolds was convicted of conspiracy and of one substantive count, count 8. Reynolds' argument on appeal concerning count 8 is essentially the same as that raised by Donna Alford with respect to her conviction on count 3, *i.e.,* that the government did not prove the essential element of venue. Reynolds points out that in the indictment as to count 8 he is alleged to have possessed marijuana with the intent to distribute in violation of 21 U.S.C. § 841(a)(1) on or about September 17, 1982, in the Western District of Texas. Two government witnesses who were present at the transaction in question testified as follows:

Q. ... Was there any person by the name of Clarence—did you see a person named Clarence in the Big Bend area on or about September the 17th, 1982?

A. [of Sandra Buck]: Not in the Big Bend area.

. . . .

THE COURT: Ever at any time, did you ever see Mr. Clarence Reynolds in the Big Bend Park?

THE WITNESS [Sheldon Barnum]: No sir.

---

have occurred in the absence and without the knowledge of the defendant, provided such statements and acts were knowingly made

and done during the continuance of such conspiracy, and in furtherance of some object or purpose of the conspiracy.

. . . .

THE COURT: The only time you ever saw him was in the Dallas area; is that correct?

THE WITNESS: That is correct.

Thus, venue clearly was not established with respect to count 8 as to Clarence Reynolds.

The government's argument that Reynolds' conviction may be upheld on an aiding and abetting theory fails for the same reasons that it failed with respect to Donna Alford's count 3 conviction, *i.e.*, that no jury instruction was given on that theory.[8] *See Wilson,* 657 F.2d at 762–63. Unlike in Donna Alford's case, the government has not urged the application of the *Pinkerton* principle to replace the inapplicable aiding and abetting theory with respect to Reynolds' conviction. We decline to apply the *Pinkerton* principle *sua sponte.* Accordingly, because there is insufficient evidence to sustain Clarence Reynolds' conviction on count 8, we reverse his conviction on count 8.

### C. *Bobby Ray Weempe*

Bobby Ray Weempe was convicted of conspiracy and of one substantive count, count 8. In count 8, Weempe was charged along with Billy Alford, Jose Lozano, Manuel Acosta, Trinidad Aranda and Clarence Reynolds for possession with intent to distribute marijuana on or about September 17, 1982.

The government has not responded to Weempe's allegation of insufficient evidence on count 8. However, in presenting the facts in its appellate brief, the government describes Weempe's involvement in the September 17 transaction as consisting of "assisting in transferring the entire cargo into Reynolds' residence." The cargo of marijuana had been delivered to Reynolds' trailer on Cedar Creek Lake near Dallas by Sheldon Barnum and Sandra Buck. Barnum's testimony concerning Weempe's involvement was that after he arrived at Reynolds' trailer, he and Buck spent the night there, and the next morning "Bobby Weempe and Billy Alford took Sandy Buck off and I stayed in the house trailer." It is not clear from this testimony who comprised the "we" in "we unloaded it out of the Winnebago," although Barnum earlier in the line of questioning had referred to "Bobby" with respect to his leaving with Buck. It is possible that the jury inferred that Weempe was one of the individuals participating in the unloading in Dallas. However, there is no testimony in the record that on the occasion specified in count 8 Weempe was involved in any of the activity in the Western District of Texas; in fact, the witnesses who referred to Weempe's role specifically testified that they did not see him in the Big Bend Park area on the occasion in question (Buck) or at any time (Barnum).

If we were to construe the government's lack of response to the lack of evidence connecting Weempe with the activities in the Western District involved in count 8 as implicitly incorporating the aiding and abetting theory it raised on somewhat similar facts to Donna Alford's involvement in count 3, and Clarence Reynolds' involvement in count 8, its argument would fail for the reasons set forth fully in the discussion of Donna Alford's conviction on count 3. Further, the government in not responding to Weempe's allegations concerning count 8 has also not urged us to apply the *Pinkerton* principle to sustain the conviction. Accordingly, congruent with our disposition of the meritorious insufficient evidence arguments by other appellants to whom the government has not urged us to apply the *Pinkerton* principle, we decline to do so *sua sponte* with respect to Weempe. Therefore, finding insufficient evidence to sustain Bobby Ray Weempe's conviction on count 8, we reverse his conviction as to that count. *See Wilson,* 657 F.2d at 762–63.

### D. *Frankie Cooper*

 Frankie Cooper was found guilty of the conspiracy count and of counts 10

---

**8.** For a detailed discussion of the inapplicability of the aiding and abetting theory to the requirement of proving venue in this case, see the foregoing discussion concerning Donna Alford's conviction on count 3, which we do not repeat here.

and 11 for possessing marijuana with intent to distribute. Count 10 concerned activities on or about December 21, 1982, with co-defendants Billy Mel Alford and Jose Lozano. Count 11 concerned activities on or about January 22, 1983, with the same co-defendants and also Manuel Acosta. The government has not specifically responded to Cooper's arguments in its briefs. However, it has summarized the relevant testimony in its presentation of the facts in its original brief.[9]

As to count 10, the following evidence concerning Cooper's participation in the transaction was presented to the jury. Carol Gordon, who drove to the Big Bend Park area with her husband, Fred Gordon, in a motor home, testified that after the breakdown of the vehicle on the way her husband called Billy Alford about the problem. Her testimony continued as follows:

9. Also, at oral argument the government responded to Frankie Cooper's allegations of insufficient evidence to convict him by pointing to evidence in the record that it considered sufficient.

10. The testimony continued as follows:
Q. Take your time. If you can't identify the man, tell us. But if you can, take your time, though.
A. I am not sure. But the one with the beard, of course, I haven't got my glasses on.
Q. Do you need your glasses, is that your problem? Do you have them?
A. Not in the courtroom, I don't.
Q. Well, would it help you if you got closer to these people that you think—
THE COURT: Why don't you take my glasses and see what happens. I have got trifocals. I am an old man. Maybe these will help.
MR. McDONALD: If you need to walk down, that's fine.
THE WITNESS: I still can't. I'm sorry.
MR. McDONALD: May the witness—
THE COURT: You may. If you need to come down, if you are having a problem seeing.
BY MR. McDONALD:
Q. If you are not sure, just tell us you are not sure.
A. I am not sure.
Q. Okay. Now, how did you know this man?
A. How had I known Frankie?
Q. Yes.
A. Yes.
A. He left with Billy Alford. That was before we started out on the highway.
Q. Okay. Are you talking about Dallas?
A. Yes.

A. He called him, talked to Alford. Billy Alford came out there. I would say between 20 or 30 minutes. Frankie was with him at the time.
Q. Frankie Cooper?
A. Yes, sir.
Q. Is this Mr. Cooper in the courtroom, and if so see if you can identify him. I know there is a lot of people, and maybe some of them are blocked to you. If you need to stand up to look around, that is fine.
A. I am afraid I can't.

The witness continued unsuccessfully to try to identify Frankie Cooper (with the help of the judge who unselfishly offered her the aid of his spectacles).[10] Nevertheless, she continued to testify about the incident and how the motor home was repaired and then driven on to the Big Bend area.[11] Gordon further testified that after

Q. Okay. Had you known Frankie Cooper before that?
A. No, sir.
Q. All right. So that was the first time that you had seen him?
A. Yes, sir.

11. Gordon testified in this regard as follows:
A. All right. In any case, Mr. Alford and Frankie Cooper come up in a vehicle?
A. Yes, sir.
Q. Who is driving the vehicle?
A. Frankie.
Q. All right. What occurs there at the Apache Adams Store once Mr. Billy Alford and Frankie arrive?
A. Billy Alford, Frankie Cooper, Joe Lozano get inside of the motor home. Fred is sitting in the driver's seat holding up the lid where the motor is inside the motor home. They were trying to figure out what is wrong with—what was wrong with the motor home.
Q. Okay.
A. And they couldn't get it fixed theirselves, so Billy Alford told Frankie Cooper to stay with us and to go into town to have the motor home fixed.
Q. All right.
A. And he sent Frankie along with Fred and I to pay for the expenses of having the motor home repaired.
Q. Where did you—did a tow truck come?
A. Well, Billy called a tow truck to come out and pulled the mobile home into town, which was Alpine, pull it into a garage deal.
Q. All right.
A. They had it repaired. Before it was repaired, we had, Fred and I and Frankie left

arriving at the park area, the motor home was loaded with 1500 pounds of marijuana in big trash bags by a number of men including Frankie Cooper. She then testified that upon returning with the load of marijuana to Dallas, after Billy Alford left with her husband, she "was left there in the motor home with Joe Lozano and Frankie asked them where they were going or what they were going to do. They said they had to stay behind and weigh and bag the marijuana."

Cooper vigorously argues that Gordon's inability to identify him at trial is of "critical importance," given that her testimony was the only testimony linking him with the marijuana. Cooper points out that he offered his own testimony concerning the incident in which he assisted the disabled motor home. He testified that as Billy Alford's brother-in-law, he would see him ten or twelve times a year. He further testified concerning December of 1982 that he went to the Big Bend Park area with his brother-in-law to deliver some horses, encountered the disabled motor home, attempted to repair the motor home, signed a receipt for work done on the home, and then returned with his brother-in-law to Dallas.[12]

and went across the way from the garage to have something to eat, and we came back to the motor home and I would say maybe an hour or hour and a half from there, they had the motor home repaired. Frankie paid it in cash. He drove, Frankie drove us to Highway 118, up to the Big Bend area....

12. Cooper's testimony about his Big Bend Park area trip was as follows:

[A]t the time I wasn't working because, like I said, I was driving a truck at the time and we couldn't get down to load. And my brother-in-law had talked to me earlier and I had told him that I hadn't been working, Billy Mel Alford, and he had called me a couple of days later and asked me did I want to go take some horses down to the Big Bend area. I said yeah, I will go. He said I can't pay you much, but I will pay you a little if you will go and help me drive down there. I said yes, sir, I will go.
Q. Did you go with him?
A. Yes, sir. I did.
Q. What were you in?
A. It was in a pickup that was a two horse trailer, a horse trailer carries two horses.
Q. Was that your pickup?
A. No, sir.
Q. Whose was it?
A. It was Mr. Billy Alford's.
Q. How much were you going to get paid for helping him out?
A. Fifty dollars.
Q. On that trip did you run into the lady that testified?
A. Yes, I did.
Q. Was she with anybody else?
A. Yes, sir.
Q. Do you know their names?
A. I think it was Jack, I believe. The way they introduced me, that was his name.
 * * * * * *
Q. What were the circumstances that you saw the Gordons? What were they doing, what were you doing?

A. I believe they was on the side next to a store and we had pulled up to get gas and Billy had went in to pay for the gas, and get us a couple of Cokes. I looked up and seen this gentleman hollar for Billy to come over there, and when he did, that is when he shook his hand and they was talking. I get through putting gas in, I walked up to try—
Q. Who is he?
A. Billy.
Q. Okay.
A. Pull around, asked me, said if I will help boost their motor home off, and it wouldn't boost off, couldn't get it cranked.
Q. Okay. You didn't know the Gordons at that time?
A. No, I did not.
Q. How come you ended up with them in Alpine at the garage?
A. Well, I had helped them work on it. I guess I am more or less kind of a shade tree mechanic, I helped them try to get it started and couldn't. So about this time they called the wrecker, and he asked Billy to see if he could pull it in to Alpine. He said he had to take the horses.
Q. Who is he that asked Billy?
A. The Jack.
Q. The person that was with Carol Gordon?
A. Yeah. And asked Billy to take the horses, take the motor home back and he said he had to take the horses up here because he had them sold.
Q. All right. They called the wrecker. Why were you with them instead of with Billy?
A. Because I stayed behind to try to help them fix the motor home. They offered to pay me, since they said I was a halfway mechanic. We got it cranked at one time, and it died, and Billy had to take the horses up there. He said it was right up the road, so that is what I done.
 * * * * * *
Q. And after you were towed back to Alpine, who was it that signed for the work that was done?

. In view of the conflicting testimony presented, the jury was faced with a credibility choice. Cooper's argument that Gordon was unable to identify him in court at a distance of a few feet goes to her credibility concerning the extent of his involvement in the marijuana transaction, e.g., that he also was present in the Big Bend Park area and was one of the people whom she observed loading a large quantity of marijuana into the vehicle.[13] Cooper, by his own testimony established his presence at the scene of the repair of the motor home. The additional evidence relied upon by the government establishing Cooper's presence at the repair shop, i.e., the actual document signed by Cooper and the testimony of the tow truck mechanic who made an in-court identification of Cooper, is merely cumulative. It can hardly be construed to bolster Gordon's testimony concerning Cooper's actual involvement in the marijuana transaction. Nevertheless, it cannot be said that a reasonable jury could not have accepted Gordon's testimony, in which she identified

Cooper by name, as "adequate and sufficient to support the conclusion of the defendant's guilt beyond a reasonable doubt" when the evidence is viewed in the light most favorable to the Government. *United States v. Burns*, 597 F.2d 939, 941 (5th Cir.1979); *see United States v. Bell*, 678 F.2d 547, 549 (5th Cir.1982) (en banc), *aff'd* 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983). Accordingly, Frankie Cooper's conviction on count 10 is affirmed.

As to count 11, Carol Gordon testified that the following month, around the 18th or 19th of January 1983, she and her husband Fred made a second trip to the Big Bend Park area in a motor home to bring a load of marijuana back to Dallas. Her testimony concerning the involvement of Frankie Cooper in this trip was to the effect that Cooper was present when the trip began in Dallas and later reappeared en route at a motel in Fort Stockton, Texas, and then was present in the Big Bend Park area where he assisted in loading marijuana into the motor home.[14] Cooper again

A. I was—they was at the back of the motor home. I stayed up there—
Q. Who is they?
A. Carol and Jack. They was at the back of the motor home. Like I say, I guess they was *sleeping or something.* And I had stayed up front and helped the gentleman work on it. And we had got it going and so the gentleman handed me the bill. I said it belongs to them back there, so I walked back there and told them that they had fixed the motor home, and they got up. When they did, he said well, here is the money, go up there and pay for it. So when I went up there, I signed my name in it and paid for it and come back and give him the money.
Q. Did you sign your name?
A. Yes, sir, I did.
Q. How did you get back to Dallas? Did you go back with the Gordon's?
A. No, I did not.
Q. How?

\* \* \* \* \* \*

A. .... I got back in the pickup with Billy and we went back to Dallas.
Q. Did you get paid for the work you did on that motor home?
A. Yes. Fred had given me $100.00. [Fred is apparently the same individual referred to earlier in the testimony as Jack.]
Q. All right. And did Billy Mel pay you?
A. Yes. He gave me $50.00 for driving for him down there.

Q. Were there 1,300 pounds of marijuana in that motor home?
A. No, sir.
Q. Was there one pound of marijuana in that motor home?
A. *No, sir. Not by my knowledge there wasn't.* I never did really go to the back, but no, sir.

13. Gordon's credibility that she saw Cooper do all of the things that she testified about is further weakened because of her inability to identify Cooper at trial by the fact that she also testified about Cooper's involvement with respect to the events involved in count 11, discussed *infra.*

14. Her testimony regarding this trip was as follows:

Q. .... Now, Billy Alford, Frankie Cooper, Joe Lozano came by the rental house where you were living?
A. Yes, sir.
Q. What kind of vehicles were they in, or was there any vehicles out front when you arrived over at your home?
A. He was in a pickup, but I can't remember which one it was.
Q. Did you all have any conversations?
A. My husband just told me, Fred told me to go ahead and go do my errands, buy groceries or whatever.
Q. Groceries for what?

provided an alternative explanation concerning his presence at the motel in Fort Stockton. He testified that he again made a trip with Billy Alford to the Big Bend Park area to deliver horses and that they stayed overnight at a motel in Fort Stockton.[15]

A. For our trip.

She testified further that upon her return, the motor home was sitting out in front of her home and Billy Alford, Frankie Cooper, and Joe (referred to as Jose in the indictment) Lozano were there. She, her husband, and Lozano left in the motor home for Big Bend Park. They stopped in Fort Stockton, Texas, at the Sands Motel Restaurant. Her testimony continued as follows:

A. Joe Lozano, Fred and I, went into the restaurant and ordered breakfast. Joe Lozano said he was going to have to talk to Billy because he had seen his truck there. While he was gone, Fred, my husband, got up and looked out the window and said Billy, Frankie just left . . . .

\* \* \* \* \* \*

. . . . Then we left the motel enroute to the Big Bend area.

Q. Un huh.

A. We got to Gate 4, turned in, went about at least two miles in about the same vicinity we were in the first time.

Q. Okay. And what happened on this particular occasion?

A. We parked the vehicle and waited, and it was around 10:00 o'clock, Billy Alford, Frankie Cooper, Manuel, Samuel appeared.

Q. Okay.

A. They came inside the motor home. They had a bite to eat and they laid down and slept until around 2:00 o'clock.

Q. Okay.

A. The motor home was loaded by Frankie Cooper, Billy Alford, Manuel, Samuel and Joe Lozano.

Q. What was in the motor home?

A. Marijuana.

Q. I'm sorry.

A. Marijuana in big trash bags.

Q. Okay. Do you know approximately how much was loaded at this time?

A. Eleven hundred pounds.

\* \* \* \* \* \*

Q. Did anything happen on your way out of this area?

A. Yes, sir. A State, after we turned out of the gate area from Gate 4 heading back toward on our way to Dallas, more or less from Alpine and Big Bend area, we were stopped I would say 50 miles from Alpine by the DEA Agents and told to get out of the motor vehicle. And they searched the motor home at that time and arrested us.

Again, as in count 10, Cooper's own testimony established his presence at one of the places where Gordon had testified he had been and provided an alternative and innocent explanation of his presence there. Although Cooper acknowledges staying at the motel in Fort Stockton, he denies having seen Gordon there.[16] Again, the con-

\* \* \* \* \* \*

Q. Okay. And so did you give any statements concerning this?

A. Yes. I sure did.

15. Cooper testified as follows about this trip:

A. Oh, I think it was in January of '83, I believe. We had, like I say, this time of year there is not much work down where I live.

Q. Is there anything up there that would give you the exact date?

A. Yeah, right here. The 20th. Right here.

Q. The 20th of what?

A. Of January, '83.

Q. Of 1983?

A. Yeah.

Q. This time were you coming down to Big Bend?

A. Yeah. He had some more horses that he was taking to a gentleman up there and asked me did I want to go again, and I said sure.

Q. Did you deliver the horses?

A. Yes, I did. I went.

\* \* \* \* \* \*

Q. What did you do after you delivered the horses?

A. Well, like I say, we left early that morning. It was late when we had gotten down there, and we eat with the people, stopped in a few places and let the horses rest, walked them. It was pretty late when we got down there, and we had eaten with the people and it was getting pretty late. And I asked Billy was he ready to go, he said yes. So we had left and started back and I started driving. Then we got out of Alpine going to Fort Stockton and Billy was already asleep, I had done got tired and asked him if he wanted to spend the night at the motel. He said sure. He said pick any of them. So I pulled in a motel and signed my name here and spend the night at the motel.

Q. Did you sign your name?

A. Yes, sir. I did.

Q. Did you put your address?

A. Yes.

Q. Is that your real address?

A. Yes, sir.

16. Gordon had not testified that Cooper had seen her at the motel—only that her husband had stated that he had seen Cooper. Thus, there is no actual conflict in the testimony concerning Cooper's presence at the motel.

flicting testimony presented a credibility choice for the jury which clearly accepted Gordon's version of the facts which included Cooper having participated in the loading of the marijuana. Cooper, of course, denied any such participation. Gordon's direct testimony that Cooper participated in the loading of the marijuana coupled with the evidence regarding Cooper's presence in the Fort Stockton area enroute at the same time as the Gordons were there was adequate and sufficient to support the finding of Cooper's guilt beyond a reasonable doubt. *See Bell*, 678 F.2d at 549; *Burns*, 597 F.2d at 941. Accordingly, Frankie Cooper's conviction on count 11 is affirmed.

### E. *Manuel Acosta*

Manuel Acosta was convicted on the conspiracy count and substantive counts 6, 7, 8 and 11. Acosta argues that the government failed to prove his knowledge of the destination of the marijuana he handled or the alleged elaborate distribution scheme for it, or even his knowledge that it was marijuana that he was handling. The government argues that it proved that Acosta furnished the marijuana for the conspiracy and housed couriers when necessary. It urges that the fact that individuals performed different roles in the drug trafficking operations or were not aware of the full scope of the scheme does not lessen their culpability. Acosta has been identified as the person that Alford allegedly paid $5000 to be introduced to (testimony of Robert Bearden quoted in part II *supra*.)

Acosta was implicated through other evidence in the drug trafficking operations. Sandra Buck testified that on four trips she made to the Big Bend Park area to obtain marijuana, she waited at Acosta's residence while the marijuana was loaded. She identified Acosta in the courtroom.

Sheldon Barnum testified that on a trip to the Big Bend Park area he and Sandra Hallett and Billy Alford and Jose Lozano all stayed at Acosta's house overnight. He testified further that according to Billy Alford's instructions they continued to stay there doing nothing for several days because of the possibility that the truck that they left at the trailer park was being watched. Some days later, a decision was made to unload the marijuana from the vehicle. Barnum drove the truck according to directions given by Trinidad Aranda to a place where he was met by Aranda, Lozano, Alford, and Acosta. After unloading, Acosta and two of the other men took the marijuana away by horseback. After Barnum cleaned out the truck and parked it back at the trailer park, he went back to the house of Aranda who took him to Acosta's house from where he and Alford left for the Odessa airport to fly back to Dallas. The foregoing facts concerning Acosta's involvement are all from Barnum's testimony. Barnum identified Acosta at trial.

Thus, the jury could have reasonably found Acosta guilty of the four substantive counts based on the descriptions of his role in the transactions by Buck and Barnum. We find that the evidence was adequate and sufficient to support the finding of Acosta's guilt beyond a reasonable doubt. *See Bell*, 678 F.2d at 549; *Burns*, 597 F.2d at 941. Accordingly, Manuel Acosta's convictions on counts 6, 7, 8 and 11 are affirmed.

### F. *Billy Mel Alford*

Billy Mel Alford was convicted on all ten substantive counts as well as the conspiracy count. On appeal, he argues that the evidence was insufficient to convict him because the uncorroborated testimony of the co-accomplices was "highly suspect and inherently untrustworthy." [17] He argues that each of the witnesses revealed motives for providing untrustworthy testimony including having a sentence under review by the same court, avoiding prosecution in the case, and receiving financial assistance from the government. Alford particularly complains that the court's instructions to the jury concerning the testimony of the

---

17. We address Alford's argument concerning uncorroborated testimony without determining that in fact the testimony was uncorroborated.

accomplices were inadequate and did not render the error of lack of corroboration harmless.[18]

■ The government has not responded to Alford's claims of insufficient evidence and inadequate instructions. The law in this Circuit is clear as to the use of the uncorroborated testimony of an accomplice: "a conviction may be based solely upon the uncorroborated testimony of an accomplice if the testimony is not incredible or otherwise insubstantial on its face." *United States v. Silva,* 748 F.2d 262, 266 (5th Cir.1984) (citing *United States v. Moreno,* 649 F.2d 309, 312 (5th Cir.1981)).[19] Since the testimony of the government witnesses concerning the detailed events comprising the various marijuana transactions was not inherently incredible or otherwise insubstantial the district court did not err in overruling Alford's motion for judgment of acquittal based on insufficient evidence to convict. Although, we need not reach the issue of the cautionary instructions by the district court, we note that rather than being as alleged only "fleeting words in a multi-page charge," the instructions given were complete, emphatic and adequate.

Finding no error in permitting Alford to be convicted on the testimony of accomplices presented to the jury with cautionary instructions, we affirm Billy Mel Alford's convictions on counts 2 through 11.

### G. *Trinidad and Maria Aranda*

■ Trinidad and Maria Aranda rely on the following theory on appeal to argue that only one substantive count of possession was proved by the government: the evidence that different members of the conspiracy were in possession of marijuana at different times, given that all were charged with being engaged in the same continuing criminal enterprise, does not establish that the individual possessions were parts of different criminal enterprises. The Arandas argue further that there was no evidence introduced to show whether the marijuana was obtained at different times or all at one time, but shipped at different times. They cite three cases in support of their argument that proof was presented of only one substantive offense.

In *United States v. Jones,* 533 F.2d 1387 (6th Cir.1976), *cert. denied,* 431 U.S. 964, 97 S.Ct. 2919, 53 L.Ed.2d 1059 (1977), Jones was indicted on five counts and convicted on three counts of possessing a revolver on separate occasions. The court noted that "[t]he question whether a continuing offense exists is a question of statutory construction, since Congress has the power to punish different aspects of the same crime." *Id.* at 1390 (citing *United States v. Universal C.I.T. Credit Corp.,* 344 U.S. 218, 224, 73 S.Ct. 227, 230, 97 L.Ed. 260 (1952)). Noting that there was "no proof that there was any interruption in the possession by Jones of the weapon," the court concluded that Jones could "be convicted upon only one count of possession."[20] *Id.*

---

**18.** The relevant jury instructions were:

The testimony of an alleged accomplice, the testimony of one who is shown to have used addictive drugs during the period of time about which he or she testified, and the testimony of one who provides evidence against a defendant for pay or for immunity from punishment or for personal advantage or vindication, must always be examined and weighed by the jury with greater care and caution than the testimony of an ordinary witness. You, the jury, must decide whether the witness's testimony has been affected in any of those circumstances, or by his or her interest in the outcome of the case, or by prejudice against the defendant, or by the benefits that he or she has received either financially or as a result of being immunized from prosecution; and, if you determine that the testimony of

such a witness was affected by any one or more of those factors, you should keep in mind that such testimony is always to be received with caution and weighed with great care.

You should never convict any defendant upon the unsupported testimony of such a witness unless you believe that testimony beyond a reasonable doubt.

**19.** The Texas law on this issue that Alford presents in his brief is inapplicable to his federal convictions.

**20.** The court discussed at length cases from previous centuries involving multiple cohabitation and multiple acts of baking of bread on the Sabbath, in each of which situations the respective courts found only a single offense to have

at 1391, 1392. In reaching this conclusion, the court interpreted Congress' intent concerning the possession of firearms to be "to punish as one offense all of the acts of dominion which demonstrate a continuing possessory interest in a firearm." *Id.* at 1391. *Jones* is not directly on point as to drug offenses, but does in a somewhat analogous situation help to define "possession," *i.e.*, as a course of conduct, not an act. *Id.*

In *United States v. Mathis*, 673 F.2d 289 (10th Cir.), *cert. denied*, 457 U.S. 1120, 102 S.Ct. 2935, 73 L.Ed.2d 1334 (1982), the Tenth Circuit found that all of the separate counts involving the sale of cocaine to undercover agents, *i.e.*, the actual sale of a half pound of cocaine at 5 p.m., the preliminary transfer of a sample at 1 p.m., and the possession of additional cocaine discovered upon the arrest, were "unquestionably one criminal enterprise" rather than independent transactions. *Id.* at 292. *Mathis* cites another Sixth Circuit case with a similar holding: *United States v. Woods*, 568 F.2d 509 (6th Cir.), *cert. denied*, 435 U.S. 972, 98 S.Ct. 1614, 56 L.Ed.2d 64 (1978). In *Woods*, the defendant and others were charged with four separate counts of violating federal narcotics law, all on or about the same date. One count was for possession with intent to distribute 111.36 grams of heroin. The second count was for distributing 111.36 grams of heroin. The third count was for unlawful possession with intent to distribute 115.37 grams of heroin. The fourth count was unlawful possession with intent to distribute 95.34 grams of heroin. The heroin involved in counts one and two was the same heroin. In discussing the convictions of the defendant on all counts, the Sixth Circuit noted that "as long as the statute does not graduate the gravity of the crime of possession of heroin by the quantity possessed, we see no indication that Congress intended to per-

mit a multiplication of the offenses of possession at any given time by a defendant upon evidence that the heroin may merely have been separately packaged or stashed." 568 F.2d at 513 (footnote omitted). The Arandas rely heavily on this observation to argue that all of the substantive counts in this case may have involved a single quantity of marijuana that was delivered and packaged on separate occasions.

An important distinction exists, however, in the facts in *Woods* and *Mathis* and the facts in this case. In *Woods* and in *Mathis* all of the counts in the indictment concerned events that occurred on the same day, while in the present case each count pertained to events weeks or months apart and involved separate trips to a source location. While the government did not put on specific proof of the actual source of the marijuana that was loaded on each occasion in the Big Bend Park area, the jury could well have inferred from all of the circumstances that on each trip (count), a new load of marijuana was obtained, albeit perhaps from the same supplier. In essence, the counts concerned different large amounts of marijuana transported on different occasions to Dallas from the Big Bend Park area. Accordingly, we affirm the convictions of Trinidad Aranda on counts 6, 8, and 9 and of Maria Aranda on counts 6 and 9.

## IV. CONSPIRACY

▆ All[21] defendants participating in this appeal have been convicted of conspiracy to possess marijuana with intent to distribute. *See* 21 U.S.C. § 846. With the exception of Trinidad and Maria Aranda, they have all alleged that the evidence was insufficient to sustain their convictions for conspiracy.[22] "The government must prove beyond a reasonable doubt (a) that a

occurred. *Id.* at 1390–91 (citing *In re Snow*, 120 U.S. 274, 281, 7 S.Ct. 556, 559, 30 L.Ed. 658 (1887), and *Crepps v. Durden*, Cowper 640 (K.B. 1777)).

**21.** Except for Herbert Arney, who was convicted *only* on the conspiracy count, all of the appel-

lants were also convicted of at least one substantive count.

**22.** The Arandas have challenged only their convictions on the substantive counts.

common agreement or conspiracy existed, (b) that the accused knew of the conspiracy, and (c) that the accused, with knowledge, voluntarily joined the conspiracy." *United States v. Elam,* 678 F.2d 1234, 1245 (5th Cir.1982). However, "[t]he essence of conspiracy under section 846 is an agreement to violate the narcotics laws." *United States v. Davis,* 666 F.2d 195, 201 (5th Cir.1982) (citation omitted). The government need not prove knowledge of all the details of the conspiracy by any of the appellants, but only that they had knowledge of the essential object of the conspiracy. *Id.* (citing *United States v. Alvarez,* 625 F.2d 1196, 1198 (5th Cir.1980) (en banc), *cert. denied,* 451 U.S. 938, 101 S.Ct. 2017, 68 L.Ed.2d 324 (1981)). The evidence proving knowledge may be circumstantial and no showing of an overt act is required. *Davis,* 666 F.2d at 201 & n. 9.

■ We find, after reviewing the record, that, viewing the direct and circumstantial evidence in the light most favorable to the government, a reasonable jury could have found each of the appellants guilty of conspiracy under 21 U.S.C. § 846. *See Bell,* 678 F.2d at 549. The pertinent evidence noted in our review of the record will be briefly described with respect to each appellant who has challenged conviction on count 1.

### A. *Manuel Acosta*

The jury could reasonably have inferred Manuel Acosta's guilt from the evidence presented which included his repeated presence at the loading areas near Big Bend Park, his participation in the removal of one load by horseback to avoid the dangers of possible surveillance, and his housing of various other members of the conspiracy. We affirm Acosta's conviction on count 1.

### B. *Bobby Ray Weempe*

The jury could reasonably have inferred Bobby Ray Weempe's guilt from the evidence presented, which included his participation in unloading the marijuana at its Dallas destination, despite our reversal for insufficient evidence on the substantive count concerning that occasion, but more importantly, from his accompanying Sandra Buck on at least four occasions to pick up loads of marijuana from the Big Bend Park area. We affirm Weempe's conviction on count 1.

### C. *Clarence Reynolds*

The jury could reasonably have inferred Clarence Reynolds' guilt from the evidence presented which included his picking up approximately 200 pounds of marijuana in his Ford pick-up truck from Alford's lake lot on one occasion and his usual participation in distributing the marijuana upon its arrival in Dallas. We affirm Reynolds' conviction on count 1.

### D. *Frankie Cooper*

The jury could reasonably have inferred Frankie Cooper's guilt from the evidence presented which included his participation in repairing one of the vehicles en route from Dallas to the Big Bend Park area and his participation in loading the marijuana into a motor home on two occasions. We affirm Cooper's conviction on count 1.

### E. *Donna Alford*

Although we are reversing the convictions of Donna Alford on two of the three substantive counts for insufficient evidence, *see* part III A, *supra,* there was nevertheless sufficient evidence presented for the jury to have reasonably inferred her guilt on the conspiracy count. This evidence included her role in the precise packaging of small quantities of marijuana in Dallas, taking Sandra Buck to the motor home used on Buck and Sheldon Barnum's first trip to pick up marijuana, and picking up Barnum and Billy Alford at the airport in Dallas on an abortive trip in which the motor home was left behind. Donna Alford was also in the company of her husband at various times during the course of the conspiracy. Evidence that "one is married to, associated with, or in the company of a criminal does not support the inference that that person shares the criminal's guilty knowledge." *Forrest,* 620 F.2d at 451 (footnotes omitted). Thus, there is very little evidence to support an inference that Donna Alford was a knowing partici-

pant in the conspiracy. The major evidence is her participation in the packaging of the marijuana in her home. While evidence of this participation would not sustain her conviction on a substantive count for lack of proof of venue, that theory of insufficiency does not apply to her conspiracy conviction. *See Winship,* 724 F.2d at 1125. We affirm Donna Alford's conviction on count 1.

### F. *Herbert Arney*

Herbert Arney was convicted on only the conspiracy count. The jury could reasonably have inferred Arney's guilt from the evidence presented. The evidence consisted of testimony by Carol Gordon and by Sheldon Barnum. Gordon, after identifying Arney in court testified concerning a conversation she had with Billy Alford and Arney concerning a statement that she had made to the police after her arrest. Gordon testified that Alford and Arney wanted her to keep her mouth shut in exchange for legal help in her case.[23]

At trial, Arney testified that he recalled accompanying Billy Alford (whom he had known as a child) to Carol Gordon's house, but explained his presence there as to help "her load a couch and a bed and move some furniture on a pickup for her."[24] Thus, an issue of credibility[25] was presented to the jury concerning Arney's knowledge of the conspiracy, albeit at a very late phase, when efforts to defend the impending prosecution were under way.

The other evidence introduced was Barnum's testimony that Arney received portions of the marijuana brought to Dallas. Arney argues that this testimony pertains

---

**23.** Gordon's testimony regarding the conversation was as follows:

Q. You had given a statement?
A. Yes.
Q. How did Mr. Alford know about that, did you tell him about that statement?
A. No.
Q. Okay. did he tell you how he found out about that?
A. He said he found out through attorney Edwin Segal.
Q. Was Mr. Segal one of the attorneys representing you?
A. Yes, sir.
Q. Now, tell the jury about the conversation between yourself and Mr. Alford and Mr. Arney?
A. Okay. Billy introduced me to Herbert Arney as Sailer.
Q. There in the truck?
A. In the truck. Billy had asked me what did you say in your statement. I told him I couldn't remember because I was sick at the time. I don't remember who, or what I had said.
Q. Did you actually remember?
A. Yes, sir. I did.
Q. You didn't want to tell Mr. Alford?
A. That's right.
Q. All right. Tell us how the conversation proceeded.
A. Well, Herbert asked me the same thing. They kept asking me the same question over and over to see if I could remember it. And I just kept giving them the same answer that I didn't remember. Billy told me if I just keep my mouth shut and if I had to go do time that he would hire me another attorney and appeal my case.
Q. Mr. Alford wanted you to—

A. Mr. Alford.
Q. Keep your mouth shut?
A. Yes, sir.
Q. Not say anything?
A. Yes, sir. That's right.
Q. I'm sorry. Mr. Arney or Mr. Alford?
A. Both of them.
Q. Both of them?
A. Both Billy Alford and Herbert Arney.

On cross-examination by Arney's attorney, Gordon testified further concerning Arney's role as follows:

Q. Now, specifically, what did Mr. Arney say?
A. Mr. Arney said that he would help me if I would stay quiet.
Q. Did he indicate in what way he would help you?
A. No, sir.
Q. Do you know what way he would have been able to help you?
A. No, sir.
Q. Had you ever met Mr. Arney before that time?
A. No, sir.

**24.** Gordon had testified that when Alford and Arney came to her house, they got into a pickup truck to talk.

**25.** Arney has also argued on appeal that Gordon's testimony was not admissible under the coconspirator exception because she was no longer a member of the conspiracy at the time the statements were made. The government correctly points out that the conspiracy did not end at the time of Gordon's arrest. *See United States v. DeLeon,* 641 F.2d 330, 334 (5th Cir. 1981).

only to his possession of marijuana rather than to his knowledge of the essential details of the conspiracy. Arney points out that he was acquitted on all of the substantive counts (of possession with intent to distribute) for which he was indicted. Despite the acquittals, the government points to this evidence as indicative of Arney's participation in the distribution stage of the conspiracy. Since the acquittals could have been based on the jury's belief that there was a lack of evidence on an essential element as to the substantive counts, the mere fact of acquittal does not render the evidence in its totality insufficient to support an inference of knowledge as to the conspiracy count, especially when viewed in combination with Gordon's testimony. Thus, viewing the evidence in the light most favorable to the government, we find the evidence was sufficient to sustain Arney's conviction on count 1. Although we do not reverse Arney's conviction based on the insufficiency of the evidence against him, we note that the evidence of his guilt was not overwhelming. In view of the district court's error in ruling evidence of a remote conviction to be admissible, we remand with instructions as discussed in part V *infra*.

### G. *Billy Mel Alford*

Billy Mel Alford is described by the government as the "mastermind" of the conspiracy. He was indicted and convicted on every count in the indictment. Although he has challenged his conviction on the conspiracy count, the basis of his challenge has already been addressed in our analysis of the point of error involving the *James* hearing, *see* part II, *supra*, and in the analysis of the admission of co-accomplice testimony, *see* part III F, *supra*. We affirm Billy Mel Alford's conviction on count 1.

### V. PRIOR CONVICTION

Herbert Arney contends that the district court erred in admitting into evidence a remote prior conviction[26] since its probative value did not substantially outweigh its prejudicial effect and the court did not even make a determination on that issue. The admission of evidence of a prior conviction more than ten years old is governed by Fed.R.Evid. 609(b) which provides in pertinent part that:

> Evidence of a conviction under this rule is not admissible if a period of more than ten years has elapsed since the date of the conviction or of the release of the witness from the confinement imposed for that conviction, whichever is the later date, unless the court determines, in the interests of justice, that the probative value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect.

The standard of review for questions concerning the admission of evidence is abuse of discretion. *See United States v. Cathey*, 591 F.2d 268, 274 n. 11 (5th Cir.1979). Nevertheless, this Court in *Cathey* has interpreted the legislative history[27] of Rule

---

**26.** The conviction in question had occurred twenty-three years previously. It was for the unrelated offense of aggravated assault with only a fine imposed as a sentence. The jury was not informed of the nature or time of the prior conviction, only the fact that there had been one.

**27.** The Court summarized the relevant legislative history as follows:

> As originally presented to Congress, Rule 609(b) made inadmissible all convictions over 10 years old. Although Congress amended the Rule to allow for the use of prior convictions over 10 years old in some circumstances, the legislative history makes clear that "convictions over 10 years old will be admitted very rarely and only in exceptional cir-

cumstances." Sen.Rep. No. 1277, 93d Cong. 2d Sess. 4, *reprinted in* 1974 U.S.Code Cong. & Admin.News pp. 7051, 7062. Rule 609(b) must be interpreted in light of the gloss Congress placed on the Rule's standard of admissibility. We conclude that by use of the term exceptional circumstances Congress intended the courts to take account of the need for using a prior conviction as an essential element of the probative value—prejudicial effect balancing test mandated by Rule 609(b). The exceptional circumstances idea expressed in the legislative history responds to the "interests of justice" language of Rule 609(b).

> \*　\*　\*　\*　\*　\*

> Rule 609(b) makes overage convictions inadmissible unless the court makes the required

609(b) to require that the trial judge be "extremely cautious in admitting evidence of remote convictions." *Id.* at 275 (citation omitted).

The trial judge in this case ruled that defense counsel had opened the door to the admission of "anything" by using that word in his opening statement.[28] This ruling was made in response to the government's statement during a recess from the direct testimony of Arney that it would question Arney on cross-examination concerning his criminal record. The trial judge interpreted the use of the word "anything" by defense counsel as a waiver of rights under Fed.R.Evid. 609(b). He explained his ruling as follows:

> Because I think when counsel invites the Government to bring up anything, uses the word anything, I think they have the right to do it. I think you are not being fair with the jury when you tell them that you are going to let the Government go into anything and that you are really not, counsel. If you had qualified it, said

anything that the law will allow him to do. But there is no qualification, they just think Mr. Arney had been teaching Sunday School all his life, and that is not quite correct.

We disagree with the district court that defense counsel's use of the word "anything" constituted a waiver of Arney's right to object to potentially inadmissible evidence or otherwise suspended the operation of the rules of evidence. We use the term "waiver" without determining that it is the appropriate term in this situation. *See* 21 C. Wright & K. Graham, Federal Practice and Procedure §§ 5033, 5039 (1977). We are of the opinion that the use of the word "anything" by counsel during opening argument did not bar Arney from objecting to the admission of his remote conviction and Arney did effectively object[29] when the government notified the court that it would seek to elicit this evidence on cross-examination.

finding of probative value. The general rule, therefore, is inadmissibility. Moreover, in the Senate Report on the Rules of Evidence, the Senate noted that "convictions over ten years old generally do not have much probative value." Sen.Rep. No. 1277, 93d Cong. 2d Sess. 4, *reprinted in* 1974 U.S.Code Cong. & Admin. News pp. 7051, 7061. The presumption against admissibility is, therefore, founded on a legislative perception that the passage of time dissipates the probative value of a prior conviction. *Cf. U.S. v. Beechum*, 582 F.2d 898, 915 (CA5, 1978) (en banc) (Under Rule 404 "temporal remoteness depreciates the probity of the extrinsic offense"). The balancing scale Congress has given the courts is weighted against a finding that the probative value of a more than 10-year-old conviction substantially outweighs its prejudicial effect. Therefore, as this court stated in *U.S. v. Bibbs*, 564 F.2d 1165 (CA5, 1977), *cert. denied*, 435 U.S. 1007, 98 S.Ct. 1877, 56 L.Ed.2d 388 (1978), "Congress intended that trial judges be extremely cautious in admitting evidence of remote convictions." *Id.* at 1170.
*Id.* at 275.

**28.** The word "anything" was used by counsel in the following context during the opening statement to the jury:

> I intend to offer the testimony of Mr. Arney because I do not want you to sit in judgment of him in a vacuum. I feel that this is a very

important event in his life and your decision could be one of the most important decisions to affect him. Therefore I want you to have the benefit of him, his background and of him as an individual. I want you to know something about him. I want to give the U.S. Attorney an opportunity to delve into his background and to present to you anything that they may like to present to you that would reflect adversely upon him. We intend to show and prove to you that the Government has absolutely no corroboration which would implicate Mr. Arney in any illegal dealings except for the testimony of Mr. Barnum and Ms. Gordon.

**29.** We note that the court's ruling was not based on a motion in limine. Instead the issue arose at the appropriate time for an on-the-record determination, *i.e.*, after the prosecution's evidence had been presented. Defense counsel while not technically objecting to the introduction of the evidence contested the propriety of admitting the evidence without weighing its probative value against its prejudicial effect. *Cf. Douthit v. Jones*, 619 F.2d 527, 539 (5th Cir. 1980) (motion in limine does not serve as a standing objection to evidence of past convictions); *United States v. Cobb*, 588 F.2d 607, 610–11 (8th Cir.1978) (objection necessary at time of admission of evidence even if motion in limine to exclude has been denied), *cert. denied,* 440 U.S. 947, 99 S.Ct. 1426, 59 L.Ed.2d 636 (1979).

The trial judge, however, because of his ruling that any testimony could be elicited from Arney did not weigh the probative value of the evidence of the remote conviction relative to its prejudicial effect. Rule 609 as interpreted by this Court does require such a weighing. The requirement may be viewed as falling outside the scope of review for abuse of discretion, *i.e.*, as mandatory rather than discretionary. In *United States v. Preston*, 608 F.2d 626, 639 (5th Cir.), *cert. denied*, 446 U.S. 940, 100 S.Ct. 2162, 64 L.Ed.2d 794 (1980), this Court explained the requirement of an on-the-record determination of whether the probative value outweighs the prejudicial effect of admitting evidence of prior convictions as insuring that the trial judge has "at least taken into account the relevant considerations." *See also United States v. Shaw*, 701 F.2d 367, 385 (5th Cir.1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 1419, 79 L.Ed.2d 744 (1984). Both *Preston* and *Shaw* involved Rule 609(a) rather than (b), but (a) contains similar language regarding "determin[ing] that the probative value of admitting [the] evidence outweighs its prejudicial effect to the defendant," Fed.R. Evid. 609(a)(1). *Cf.* Fed.R.Evid. 609(b), *supra* note 27.

The Ninth Circuit has addressed the requirements of Rule 609(b) as follows:

> Under Rule 609(b), the prosecution must present evidence upon which the court can determine that the probative value of the remote conviction *substantially* outweighs its prejudicial effect. This finding must be supported by specific facts and circumstances which demonstrate that the interests of justice require that the evidence be admitted despite the presumption in subsection (b) against its admissibility.... The trial judge did not make the findings required by Rule 609(b). Presumptively, [the defendant's]

remote prior convictions were inadmissible for impeachment purposes.

\* \* \* \* \* \*

> [T]he case must be remanded so that the district court can conduct proceedings consistent with Rule 609(b)....

*United States v. Portillo*, 633 F.2d 1313, 1323 (9th Cir.1980) (emphasis in original) (citations omitted), *cert. denied*, 450 U.S. 1043, 101 S.Ct. 1763, 68 L.Ed.2d 241 (1981); *accord United States v. Mahler*, 579 F.2d 730, 736 (2d Cir.), *cert. denied*, 439 U.S. 991, 99 S.Ct. 592, 58 L.Ed.2d 666 (1978). In essence, the procedure is identical for Rules 609(a) and 609(b); however, as to the latter, before admitting the evidence the trial judge must find that the probative value *substantially* outweighs the prejudicial effect and base that finding on "specific facts and circumstances." *See* Fed.R. Evid. 609(b), *supra* note 27.

Thus, the trial judge should have made a determination of the relative probative value of the twenty-three year old conviction in comparison to the prejudicial effect on the jury.[30] In this case, the defendant's credibility was of critical importance, given that the evidence against Arney came exclusively from government informants. "Of course, the mere fact that the defendant's credibility is in issue—a circumstance that occurs whenever the defendant takes the stand—cannot, by itself, justify admission of evidence of convictions over ten years old. Such a rule would make the ten year limit in Rule 609(b) meaningless." *United States v. Brown*, 603 F.2d 1022, 1028 (1st Cir.1979).

Although we note some of the criteria for a Rule 609(b) determination, that determination must be made by the district court. Therefore, we vacate the conviction as to Arney and remand the case as to him

---

**30.** The following factors have been enumerated as relevant in cases involving defendant-witnesses in a Rule 609(a) balancing:
(1) The nature [impeachment value] of the crime.
(2) The time of conviction.
(3) The similarity between the past crime and the charged crime.
(4) The importance of defendant's testimony.
(5) The centrality of the credibility testimony.
*United States v. Hawley*, 554 F.2d 50, 53 n. 5 (2d Cir.1977); *see* 3 J. Weinstein & M. Berger, Evidence ¶ 609[03] at 609–77 to 609–78 (1982).

to the district court for that purpose. If the trial court determines that the probative value of the remote conviction did not substantially outweigh its prejudicial effect, then the conviction of Arney must be set aside and he is to be afforded a new trial.[31] If the trial court determines that the probative value did substantially outweigh the prejudicial effect, the judgment of conviction will stand affirmed and Arney is to be resentenced, *see* Fed.R.Crim.P. 32, subject to further review on appeal limited to the correctness of the ruling on the admissibility of the prior conviction under the abuse of discretion standard.

## VI. JOINDER/SEVERANCE

Manuel Acosta was named in the conspiracy count of the indictment and in five of the ten substantive counts of possession of marijuana on separate occasions between July 15, 1982 and January 22, 1983. Acosta contends that under Fed.R.Crim.P. 8 joinder was improper and the indictment was duplicitous, and that under Fed.R. Crim.P. 14 his motion for severance should have been granted.

### A. *Rule 8*

Acosta's first argument is that the joinder of offenses was improper as a matter of law under Fed.R.Crim.P. 8(a).[32] We find the joinder proper.

■ Acosta argues further that the indictment was duplicitous because it joined separate conspiracies into one count. "Duplicity is the joining in a single count of two or more distinct and separate offenses." *United States v. Starks*, 515 F.2d 112, 116 (3d Cir.1975). As to determining whether an indictment charges separate conspiracies or a single conspiracy, this Court considers "whether the alleged facts reveal a 'substantial identity of facts or participants' ...." *United States v. Metz*, 608 F.2d 147, 152 (5th Cir.1979), *cert. denied*, 449 U.S. 821, 101 S.Ct. 80, 66 L.Ed.2d 24 (1980) (applying Fed.R.Crim.P. 8(b)). In *Metz*, this Court found a single conspiracy in that "the indictment adequately show[ed] a singular conspiratorial objective: a large-scale narcotics transaction." *Id.* at 153. The Court observed that the fact "[t]hat the indictment did not charge appellants with active participation in each phase of the conspiracy does not effect misjoinder." *Id.* It is also not necessary that the indictment charge that an appellant "knew all the participants or details of the conspiracy" as long as it alleges "knowledge of the conspiracy's essential nature." *Id.*

■ The indictment here charged all defendants with knowingly conspiring to possess marijuana in excess of 1000 pounds, a Schedule I controlled substance, with intent to distribute same, contrary to 21 U.S.C. § 841(a)(1). The conspiracy was alleged to have commenced in about October 1980 and to have continued until about January 1983. The substantive counts naming Acosta were alleged to have taken place on or about July 15, August 13, September 17, 1982, October 1982 and January 22, 1983. Although not all defendants were charged on all counts, there is no indication that the separate transactions at frequent intervals

---

**31.** Because the evidence in this case as to Arney's guilt was not strong and his credibility was a crucial issue, an improper admission of a remote conviction would constitute reversible error. We leave unresolved whether in a situation where the evidence of guilt is more persuasive, the district court or the appellate court should make the initial determination as to whether any error in admitting such evidence was harmless. *Compare Portillo*, 633 F.2d at 1323 (initial determination by trial court on remand), *with Mahler*, 579 F.2d at 736 (initial determination by appellate court that any error would be harmless, obviating the need for an on-the-record determination pursuant to Rule 609(b)). *See* Fed.R.Evid. 103(a); 21 C. Wright &

K. Graham, Federal Practice and Procedure § 5035, at 169 (1977).

**32.** Rule 8(a) in its entirety reads:
 (a) Joinder of Offenses. Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.

involving various combinations of the alleged coconspirators were not part of a single conspiracy as urged by Acosta. Therefore, his allegation of a duplicitous indictment must fail. *See Metz,* 608 F.2d at 152–53; *Starks,* 515 F.2d at 116.

### B. *Rule 14*

Acosta's alternative argument is that he was prejudicially joined under Fed.R. Crim.P. 14[33] because he was indicted in only six of the counts, and that the circumstances of the trial as a whole resulted in the defendants being tried as a group, rather than individually with much of the evidence introduced at trial being inadmissible in an individual case against Acosta.

 In review of a motion for severance, this Court applies an abuse of discretion standard, which has been further defined as requiring a showing of specific and compelling prejudice. *See, e.g., United States v. Chagra,* 754 F.2d 1186, 1188 (5th Cir.1985); *United States v. Sudderth,* 681 F.2d 990, 996 (5th Cir.1982). Acosta's argument that much of the evidence would have been inadmissible in an individual trial has been previously found by this court not to support a finding of compelling prejudice. *See, e.g., Sudderth,* 681 F.2d at 996. Acquittals on some counts, albeit not with respect to Acosta, did occur and have been interpreted as supporting an inference that the jury did sort the evidence and consider it separately as to the various counts and defendants. *See, e.g., United States v. Nickerson,* 669 F.2d 1016, 1022 (5th Cir. 1982). Acosta did not establish that the prejudice to him of the joinder for trial outweighed the interest of judicial economy. We find no abuse of discretion in the trial court's failure to grant Acosta's motion for severance.

### CONCLUSION

For the reasons discussed in the opinion, we reverse the convictions of Donna Alford

on counts 5 and 6, of Clarence Reynolds on count 8, and of Bobby Ray Weempe on count 8; we vacate and remand the conviction of Herbert Arney on count 1 for further proceedings consistent with this opinion; and we affirm the convictions of defendants on all other counts.

AFFIRMED IN PART; REVERSED IN PART and REMANDED for further proceedings and for entry of judgment consistent with this opinion.

---

**33.** Rule 14 provides in pertinent part that:

If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires.